1

2

3                          UNITED STATES DISTRICT COURT

4                         NORTHERN DISTRICT OF CALIFORNIA

5

6

7    MIGUEL GALINDO SIFUENTES,

8                    Petitioner,                    No. C 09-2902 PJH

9         v.                                        **ORDER CONDITIONALLY
                                                    GRANTING PETITION FOR
10   P. BRAZELTON, Warden,                          WRIT OF HABEAS CORPUS**

11                    Respondent.

12   _____/

13         Petitioner Miguel Galindo Sifuentes, a California prisoner currently incarcerated at

14   Pleasant Valley State Prison, filed a petition for a writ of habeas corpus pursuant to 28

15   U.S.C. § 2254.  Respondent P. Brazelton filed an answer on April 26, 2013, and Sifuentes

16   filed a traverse on June 24, 2013.  The court determines that the matter is suitable for

17   decision without oral argument.  Having reviewed the parties' papers and the record, and

18   having carefully considered the relevant legal authorities, the court CONDITIONALLY

19   GRANTS the petition.

20                                     **BACKGROUND**

21   **I.     Factual Summary**

22         The following summary of the evidence presented at trial is taken directly from the

23   opinion of the court of appeal affirming Sifuentes's judgment and conviction.  Mot. Dismiss,

24   Ex. 1 (*People v. Vasquez, et al.*, No. A102559 (Cal. Ct. App. Jan. 31, 2006)) ("Slip op.").

25         At approximately 10:50 p.m. on December 11, 1998, defendants Ruben Eliceo

26   Vasquez, Hai Minh Le and Miguel Galindo Sifuentes went into the Outback Restaurant in

27   Dublin to commit a robbery.  Sifuentes entered the restaurant and asked for a table.  He

28   told the server that he was waiting for friends and ordered a soda.  Approximately a half

United States District Court

For the Northern District of California

hour later, the server prompted Sifuentes to place an order.  Sifuentes was subsequently presented with a bill.  He told the server that he needed to get money from his car.  As he was about to leave the restaurant, Vasquez and Le entered.  Le pulled out a pellet gun and marched a departing customer back into the restaurant, telling him, "This is what I do."  Defendants spread out through the restaurant and commandeered the remaining customers and employees to the kitchen area.  In the process, Vasquez robbed a man of his wallet.

Vasquez was armed with a nine-millimeter semiautomatic pistol, while Sifuentes and Le were armed with pellet guns.  In the kitchen, Vasquez demanded money and fired his gun into a fryer on one side of the kitchen.  Vasquez took the manager to his office where he stuffed his pockets with money from the cash drawer.  While they were in the office, the telephone rang.  Vasquez threatened the manager to tell the police that everything was alright or he would be killed.  The manager complied with Vasquez's order.  Meanwhile, an employee called 911 and hung up as defendants ordered the employees and customers into the restaurant's walk-in refrigerator.  Another employee was able to activate a security device before placed in the refrigerator.

Deputy Sheriff Angela Schwab responded to the 911 call but was told by the dispatch operator that the restaurant manager had reported that everything was okay.  Schwab entered the restaurant and was surprised by Vasquez.  Vasquez pointed his gun at Schwab and demanded that she give him her gun.  After he hit Schwab in the face, he took her gun.  Le put a gun to her back and he and Sifuentes walked her to the back of the restaurant.

Sheriff's Deputy John Monego arrived on the scene.  As he was entering a door to the restaurant, Vasquez shot him.  Vasquez fired additional shots at Monego after he had fallen to the ground.  The police recovered four expended cartridges in the foyer of the restaurant and three others outside the door to the restaurant, all shot from Vasquez's pistol.  Defendants fled the scene and were apprehended shortly thereafter.

**United States District Court**
For the Northern District of California

## II.      Procedural History

In February 2003, Sifuentes and his two codefendants, Vasquez and Le, were convicted in the Alameda County Superior Court of the first degree murder of Deputy Monego.  The jury also found true that Sifuentes was armed with a firearm.  The prosecution sought the death penalty against Sifuentes, but the jury did not find true the special circumstances charged against him.  Sifuentes was sentenced to 26 years to life in prison.  Sifuentes, Vasquez and Le filed a consolidated appeal to the California Court of Appeal, which affirmed the convictions on January 31, 2006.  Sifuentes filed a petition for review in the California Supreme Court, which summarily denied review on May 17, 2006.  Mot. Dismiss, Ex. 3.

Sifuentes filed a habeas petition in this court and moved for a stay to allow him to exhaust some of his claims in state court.  By order entered September 17, 2007, the court stayed the habeas proceedings to allow Sifuentes to present his unexhausted claims in state court.  *Sifuentes v. Hedgpeth*, No. C 07-4465 PJH (PR) (N.D. Cal. Sept. 17, 2007).

Sifuentes filed a pro se habeas petition in the Alameda County Superior Court, which denied the petition on October 31, 2007.  Mot. Dismiss, Ex. 4.  Sifuentes also filed an unsuccessful habeas petition in the court of appeal, and on October 3, 2008, filed a habeas petition in the California Supreme Court, which denied the petition on May 20, 2009.  Mot. Dismiss, Ex. 5.

Sifuentes, then appearing pro se, filed a new federal habeas corpus petition on June 29, 2009.  The court dismissed an amended petition and second amended petition with leave to amend.  Sifuentes filed a third amended petition on October 25, 2010.  By order entered April 13, 2012, the court dismissed two of the claims from the third amended petition and issued an order to show cause on the remaining 21 claims.  Sifuentes then filed a motion for leave to file a fourth amended petition, which the court denied by order entered August 8, 2012.

Counsel for Sifuentes filed a notice of appearance on August 10, 2012.  Subsequently, on August 21, 2012, the court granted Sifuentes's stipulated request for

leave to file a fourth amended petition and set related deadlines.  On October 28, 2012, Sifuentes filed a request for a three-month extension to file the fourth amended petition, and then filed a fourth amended petition on November 1, 2012.  By order dated November 2, 2012, the court denied Sifuentes's request for an extension of time, and deemed the fourth amended petition, filed on November 1, 2012, to be the operative petition.[1] The fourth amended petition alleged five claims for habeas relief: (1) that Sifuentes' rights to due process, equal protection, and fair trial under the Fifth, Sixth, and Fourteenth Amendments were violated when the prosecution peremptorily challenged nine potential jurors on the basis of their race; (2) that his rights to due process, equal protection, and fair trial under the Fifth, Sixth, and Fourteenth Amendments were violated when the trial court excused for cause two potential jurors on the basis of their race; (3) that application of California's felony murder rule to Sifuentes violated the Eighth Amendment's Cruel and Unusual Punishment Clause; (4) that application of California's felony murder rule violated Sifuentes's right to a jury trial because it enabled the judge, rather than the jury, to determine malice aforethought, an element of the charge; and (5) that Sifuentes's due process and fair trial rights were violated when several jurors regularly slept through key portions of his trial.

On November 29, 2012, respondent filed a motion to dismiss, which was submitted on the briefs.  By order entered February 12, 2013, the court granted the motion to dismiss the procedurally defaulted claims three and four and denied the motion to dismiss the mixed petition.  The court ordered Sifuentes either to request a stay and abeyance to exhaust claim five, or to dismiss that claim and proceed with claims one and two.

On March 4, 2013, Sifuentes filed a voluntary dismissal of claim five and a request for leave to file a motion for reconsideration of the order dismissing claims three and four. By order entered March 27, 2013, the court denied Sifuentes' request for leave to file a motion for reconsideration and set a briefing schedule on the remaining habeas claims.

---

[1] On November 16, 2012, respondent filed an administrative motion to consider whether this action was related to the habeas case filed by Ruben Vasquez, C07-4250 WHA.  By order dated November 21, 2012, Judge Alsup denied the motion to relate cases.

United States District Court

For the Northern District of California

Respondent filed an answer and supplemental exhibits ("Supp. Ex.") comprising the record of jury voir dire and juror questionnaires. *See* doc. nos. 56, 57. Sifuentes filed a traverse on June 24, 2013. The matter is now fully briefed and submitted.

### ISSUES

Sifuentes asserts the following two claims for relief:

>       (1)     that his rights to due process, equal protection, and fair trial under the Fifth, Sixth, and Fourteenth Amendments were violated when the prosecution peremptorily challenged nine potential jurors on the basis of their race;

>       (2)     that his rights to due process, equal protection, and fair trial under the Fifth, Sixth, and Fourteenth Amendments were violated when the trial court dismissed potential jurors by granting the prosecutor's challenges for cause without questioning the potential jurors.

### STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell ("Miller-El I")*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of"

United States District Court

For the Northern District of California

1  Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly

2  identifies the governing legal principle from the Supreme Court's decisions but

3  "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The

4  federal court on habeas review may not issue the writ "simply because that court concludes

5  in its independent judgment that the relevant state-court decision applied clearly

6  established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must

7  be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

8       A state court's determination that a claim lacks merit precludes federal habeas relief

9  so long as "fairminded jurists could disagree" on the correctness of the state court's

10  decision.  *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (citing *Yarborough v.

11  Alvarado*, 541 U.S. 652, 664 (2004)).  "[E]valuating whether a rule application [i]s

12  unreasonable requires considering the rule's specificity.  The more general the rule, the

13  more leeway courts have in reaching outcomes in case-by-case determinations." *Id.*  "As a

14  condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must

15  show that the state court's ruling on the claim being presented in federal court was so

16  lacking in justification that there was an error well understood and comprehended in

17  existing law beyond any possibility for fairminded disagreement." *Id.*

18       Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

19  determination will not be overturned on factual grounds unless objectively unreasonable in

20  light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340.

21  Review under § 2254(d)(1) is limited to the record that was before the state court that

22  adjudicated the claim on the merits. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

**DISCUSSION**

24  I.   ***Batson* Claim**

25       A.   **Legal Standard**

26       The Equal Protection Clause forbids a prosecutor from challenging potential jurors

27  solely on the basis of their race. *Ali v. Hickman*, 584 F.3d 1174, 1180 (9th Cir. 2009) (citing

28  *Batson v. Kentucky*, 476 U.S. 79, 89 (1986)).  The court applies a three-part test when

United States District Court
For the Northern District of California

evaluating a defendant's equal protection challenge to a prosecutor's use of peremptory strikes.  First, the defendant must make a prima facie showing that a challenge was based on race.  Second, the prosecution must offer a race-neutral basis for the challenge.  Third, the court must determine whether the defendant has shown "purposeful discrimination." *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006) (en banc) (quoting *Batson*, 476 U.S. at 98).

To make this last determination at step three of the *Batson* analysis, "the court evaluates the totality of the relevant facts to decide whether counsel's race-neutral explanation for a peremptory challenge should be believed."  *Ali*, 584 F.3d at 1180 (citations and internal quotation marks omitted).  The consideration of "purposeful discrimination" at step three of the *Batson* inquiry is a factual one.  *Id.* (citing *Batson*, 476 U.S. at 98 n. 21 ("[A] finding of intentional discrimination is a finding of fact entitled to appropriate deference by a reviewing court.")).

As part of its evaluation of the prosecutor's reasoning, the court must conduct a comparative juror analysis - that is, it must "compar[e] African American panelists who were struck with those non-African American panelists who were allowed to serve."  *Jamerson v. Runnels*, 713 F.3d 1218, 1224 (9th Cir. 2013) (quoting *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012)), *pet. for reh'g and reh'g en banc denied* Aug. 21, 2013.  "Where the prosecutor's reason for striking a black juror applies 'just as well' to a non-black juror who is selected for the panel, 'that is evidence tending to prove purposeful discrimination' that should be considered in assessing the genuineness of the prosecutor's proffered explanations."  *Id.* (quoting *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 241 (2005)).

A state court's finding that the prosecutor did not engage in purposeful discrimination is reviewed under the deferential standard set forth in 28 U.S.C. § 2254(d)(2).  *Id.* (citations omitted).  *See Mitleider v. Hall*, 391 F.3d 1039, 1050 (9th Cir. 2004).  Under AEDPA, "in evaluating habeas petitions premised on a *Batson* violation, 'our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must

United States District Court
For the Northern District of California

1   uphold it.'" *Jamerson*, 713 F.3d at 1225 (quoting *Briggs*, 682 F.3d at 1170).  "This is

2   because the question of discriminatory intent 'largely will turn on evaluation of credibility'

3   and 'evaluation of the prosecutor's state of mind based on demeanor and credibility lies

4   peculiarly within a trial judge's province.'" *Id*. (quoting *Hernandez v. New York*, 500 U.S.

5   352, 365 (1991)).

6       "Although the prosecutor's reasons for the strike must relate to the case to be tried,

7   the court need not believe that 'the stated reason represents a sound strategic judgment' to

8   find the prosecutor's rationale persuasive; rather, it need be convinced only that the

9   justification 'should be believed.'" *Id*. at 1224 (quoting *Kesser*, 465 F.3d at 359).  "Because

10  'it is widely acknowledged that the trial judge is in the best position to evaluate the

11  credibility of the prosecutor's proffered justifications,' due deference must be accorded to

12  the trial judge's determination."  *Id*. (quoting *Briggs*, 682 F.3d at 1171).  "Indeed, even if

13  'reasonable minds reviewing the record might disagree about the prosecutor's credibility,

14  . . . on habeas review that does not suffice to supersede the trial court's credibility

15  determination.'"  *Id*. (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)).

16      **B.    State Court Denial of *Batson* Claim**

17      Sifuentes claims that the prosecutor purposefully discriminated against African-

18  American jurors by striking African-American jurors immediately or almost immediately after

19  they were seated.  Sifuentes and his co-defendants made three motions pursuant to

20  *People v. Wheeler*, 22 Cal. 3d 258, 276-77 (1978), the California analog to *Batson*, to

21  challenge the prosecutor's exercise of peremptory strikes on the ground of group bias

22  against prospective African-American jurors.  *See Cook v. LaMarque*, 593 F.3d 810, 813

23  (9th Cir. 2010).  The trial court denied the defendants' first *Wheeler* motion which was

24  brought after the prosecutor exercised his peremptory challenges against three prospective

25  African-American jurors.  Defendants renewed their *Wheeler* motion after the prosecutor

26  excused two more African-American prospective jurors.  Defendants brought their final

27  *Wheeler* motion after the prosecutor excused four additional African-American prospective

28  jurors.  On each motion, the trial court found that the defendants had established a prima

facie case of discrimination and asked the prosecutor for an explanation.  The prosecutor offered reasons for excusing the jurors.  After each motion, the trial court found that the reasons proffered by the prosecutor were racially neutral and valid, and denied all three *Wheeler* motions.  Slip op. at 4-5.

In the last reasoned opinion to consider Sifuentes's *Batson* claims, the court of appeal conducted a comparative analysis of the challenged prospective jurors with the seated jurors to determine whether the prosecutor engaged in purposeful discrimination at the third step of the *Batson* test.  Slip op. at 6-14.  Finding that the record did not demonstrate that the prosecutor's reasons were pretextual, the court of appeal affirmed the conviction.  *Id.*  Sifuentes contends that the state court's rejection of his *Batson* claims was unreasonable.

### C.    Use of Peremptory Strikes Violated *Batson*

The prosecutor exercised peremptory strikes on the following prospective African-American jurors: (1) T. Jackson; (2) G. Norman; (3) A. Jasper; (4) K. Webster; (5) K. Massey; (6) M. Thompson; (7) F. Barnes; (8) K. Scruggs; and  (9) R. Gibson.

Sifuentes points out that the prosecutor exercised his peremptory strikes to remove nine out of twelve African-American prospective jurors, a 75% rate.  Traverse at 11. Sifuentes has demonstrated that this percentage exceeds the percentage of peremptory strikes found sufficient to establish a prima face *Batson* violation in other cases before the Ninth Circuit.  *See Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002) (57 percent rate of striking Hispanic jurors supported an inference of race discrimination); *Turner v. Marshall* 63 F.3d 807, 812 (9th Cir. 1995) (56 percent strike rate), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999) (en banc); *United States v. Lorenzo*, 995 F.2d 1448, 1453-54 (9th Cir. 1993) (33 percent strike rate); *United States v. Bishop*, 959 F.2d 820, 826 (9th Cir. 1992) (50 percent strike rate), *overruled on other grounds by United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc).

Furthermore, Sifuentes has demonstrated that the prosecutor exercised peremptory strikes against African-Americans at a disproportionate rate: the prosecutor used about 27

9

1    percent of his peremptory strikes against African-Americans (9 out of 33), yet African-

2    Americans represented only 13 percent of the jury pool (12 out of 92).  Traverse at 12.

3    Thus, the prosecutor used peremptory challenges against African-Americans at twice the

4    percentage of the African-American representation within the venire.  *See Fernandez*, 286

5    F.3d at 1078.  Under the "totality of the relevant facts," this statistical evidence supports a

6    strong inference of discriminatory jury selection to support a prima facie showing at step

7    one of the *Batson* analysis.  *See Batson*, 476 U.S. at 94; *Johnson v. California*, 545 U.S.

8    162, 173 (2005) (where prosecutor used three of his twelve peremptory challenges to strike

9    all the African-American prospective jurors from the jury pool, the "inferences that

10   discrimination may have occurred were sufficient to establish a prima facie case under

11   *Batson*").

12        Here, the parties do not dispute the state court's conclusion at step one of the

13   *Batson* analysis that Sifuentes established a prima facie case that each peremptory strike

14   was based on race, or that the prosecutor produced a race-neutral explanation for

15   dismissing each potential juror at step two.  The issue presented in the petition is whether

16   the state court's determination at step three, that the prosecutor did not engage in

17   purposeful discrimination, was an unreasonable determination of the facts in light of the

18   evidence presented in the state court proceedings, pursuant to 28 U.S.C. § 2254(d)(2).

19   *See Jamerson*, 713 F.3d at 1224.

20        Sifuentes challenges all nine peremptory strikes but leads his argument with *Batson*

21   challenges to the use of peremptory strikes against M. Thompson and R. Gibson.  In line

22   with Sifuentes's argument prioritizing Thompson and Gibson, the court first addresses

23   those two *Batson* challenges, then addresses the remaining seven jurors in turn.

24                 **1.    M. Thompson**

25        On the defendants' third and final *Wheeler* motion, challenging the prosecutor's

26   exercise of peremptory strikes against M. Thompson and three other African-American

27   prospective jurors, the trial court found that a prima facie showing of bias had been made.

28   The prosecutor then gave his explanation for striking Thompson as follows:

United States District Court

For the Northern District of California

1    . . . He was the one who was active in his Baptist church, involved in church programs weekly, and he expressed extreme reservations about the death penalty.

2

3    There was a question asked: "Could you do something like that?"  Page 7386: "I guess you could say it's a gray-line answer there.  I've always been taught to obey the law.

4

5    And then he says he's equivocal.  He was talking about his duty.  He understands his duty.  And I think he was confusing duty with how he felt about his penalties: "Well, because it's the law, I can do my duty."  But that didn't mean he could impose the death penalty.

6

7    He also said at 7397 that he was a minister, and he said, "So basically I can't hold judgment on anyone.  But I do have to hold account to the laws of the land."

8

9    So he said because of his religious beliefs, he wasn't in a position to make a judgment on anybody, and he repeated that several times.

10

11    THE COURT: How about the next one?

12    MR. GOODFELLOW: At 7398, he also said, "I can't say you're a bad person."  And then the judge: "Okay."

13

14    I asked him a lot of questions, and he never really would answer the questions about how do you feel about that principle.  He kept talking about duty, but he would never answer the questions.  He avoided answering any questions about what he felt about them personally.  He kept going back to his duty.

15

16

17    And based upon that, there were no questions by the defense, obviously, because they knew he was never going to come to death, it was so obvious.  He wasn't facing the issue.

18

19    So based on everything in his questionnaire and all of the answers that he gave in court and his demeanor in terms of being unable to really answer the questions and being evasive to the types of tough questions I was asking him about putting himself in that position, it's clear to me he couldn't impose the death penalty on anybody.

20

21

22    And besides that, I had many more better jurors after him that were much more pro-death-penalty.  And I'm trying to get a pro-death-penalty jury.

23

24

Reporter's Transcript ("RT") at 8970-72.  The state court concluded that the prosecutor's

25    reasons for excusing Thompson, including his active participation in the Baptist church and

26    its programs, and his equivocal responses about the death penalty, were race-neutral.  Slip

27    op. at 11-12.  Sifuentes contends that these reasons were pretextual.

28

**United States District Court**
For the Northern District of California

### a.    Views on Death Penalty

With respect to Thompson's views on the death penalty, the prosecutor argued that "based on everything in his questionnaire and all of the answers that he gave in court and his demeanor in terms of being unable to really answer the questions and being evasive to the types of tough questions I was asking him about putting himself in that position, it's clear to me he couldn't impose the death penalty on anybody." RT 8972. The prosecutor further argued that "besides that, I had many more better jurors after him that were much more pro-death-penalty. And I'm trying to get a pro-death-penalty jury." *Id.*

The state court found that Thompson stated in his juror questionnaire that he was in favor of the death penalty, and averred during voir dire that he could impose the death penalty, but also stated that "although it would depend on the circumstances, it was 'hard to say' that nonshooters would be eligible for the death penalty." Slip op. at 11-12. Thus, the state court found Thompson's responses about the death penalty equivocal and the prosecutor's reliance on this equivocation as race-neutral. However, this court's review of the record does not support that finding.

In response to the questionnaire asking about his general feelings about the death penalty, Thompson replied, "It's there as a tool . . . but not to be exploited." Supp. Ex. 3, Vol. 2 (Thompson questionnaire). He also wrote that he was "moderately in favor" of the death penalty, and that his views had not changed in the last few years. *Id.* He also wrote that he would vote in favor of retaining the death penalty if the issue was on the ballot. *Id.* Then, at voir dire, Thompson explained his views about the death penalty to show he had not eliminated the possibility of imposing the death penalty for non-shooters:

> Q.      So three people are charged; Mr. Le, Mr. Sifuentes and Mr. Vasquez entered the Outback Steakhouse with the intent to commit a robbery, and during the course of that robbery, a police officer arrived, she was disarmed and started to be taken to the back of the restaurant, and the other officer arrived, and as he got to the location, he was shot five times by one of the defendants. . . . The other two defendants are charged with a murder in that they participated in a robbery in which somebody died. Whether it's intentional or accidental, negligent, that's what they're charged with. Okay?
>          My first question to you is, how do you feel about that principle of the law that says somebody can be held responsible for murder in spite of the facts they didn't actually kill anybody?

1

A.     That's just the law.  That's being an accessory to a crime.  I mean, I might not have robbed a bank, as an example, but I was with someone who did rob a bank, so I'm just as guilty as that individual.

2

3

Q.     How do you feel about that principle, just as a person?  Not as a – as something that's part of the law, but just you as a person and knowing your background as a minister in your religion, that sort of thing.

4

5

6

A.     Well, the principle in itself, I mean, should I be held accountable, should I be – how should I put it? – lumped in or grouped with someone who does something wrong.  Well, if I know the individual, I'm caught, I'm caught.  I mean, the principle is basically what it is.  It's really not how I feel about it.  It's not like it's either right or either wrong.  The fact is I was somewhere where I shouldn't have been.

7

8

9

Q.     Let me ask you this: and then the other two individuals, you know from the factual scenario, didn't kill the officer.

10

11

A.     Um-hum.

12

Q.     Under our law, if you find that they were – the special circumstances that apply to them are true, they are eligible for one of two penalties.  And as the judge said, there's no automatic, it's either death penalty or life in prison, those are two equal options that a jury can come up with.  Okay?

13

14

15

A.     Um-hum.

16

Q.     Knowing who you are based on your philosophical beliefs, your religious beliefs, your ethical beliefs, do you think that the death penalty is a viable option for somebody who actually didn't do any killing?

17

18

19

A.     It depends on the preponderance of the evidence, it depends on the special circumstances at the time, it depends on the evidence that's presented.  Right now, just saying that one person shot another individual and the other two people were in another area of the restaurant or whatever, it's hard to say that those individuals would be eligible for it, but at that particular time, after listening to all the evidence, they may all three be eligible for it.  It all depends on what actually was going on in the restaurant.

20

21

22

23

THE COURT:     You haven't eliminated the death penalty with respect to the guys that didn't kill anybody.

24

A:     Right.
. . .

25

26

Q.     The special circumstance that you would have found as to those two defendants would have made them eligible for the death penalty or life in prison without the possibility of parole because they were major participants and they were involved in reckless indifference to human life during the course of that crime.  Okay?

27

28

United States District Court

For the Northern District of California

1

A.      Um-hum.

2

Q.      They don't have to have an intent to kill anybody.  In fact, as the factual scenario indicates, they didn't kill anybody.

3

4

A.      Um-hum.

5

Q.      Knowing that, do you think it's reasonable that – or is the death penalty still on the table in terms of a realistic option for two of these defendants who didn't kill anybody, who actually did not fire the gun?

6

7

A.      Yes, because it was accessory to a crime.

8   RT 7399-7402.  This record reflects that Thompson did not eliminate the possibility of the

9   death penalty for defendants who did not fire the gun and did not shoot the victim, as he

10  clearly indicated in response to a clarifying question from the trial judge.  RT 7401.  Further,

11  it appears that the state court mischaracterized Thompson's statement that it was "hard to

12  say" that non-shooters would be eligible for the death penalty, by quoting it out of context.

13  Slip op. at 11.  The above excerpt reflects that in response to the prosecutor's question

14  whether the death penalty was a viable option for the defendants who did not actually kill

15  anyone, Thompson indicated that it would depend on the evidence, but that "they may all

16  three be eligible for it."  RT 7401.  Thus the record shows that the prosecutor's basis for

17  challenging this juror and the state court's implicit finding that the juror expressed a clear

18  refusal or reluctance to impose the death penalty for non-shooters, is simply incorrect.

19          A comparative analysis further discredits the prosecutor's reasons for striking

20  Thompson.  The state court did not specifically compare Thompson to non-stricken jurors,

21  but did consider the seated jurors' views about the death penalty in addressing the *Batson*

22  challenge with respect to another stricken African-American potential juror, T. Jackson.

23  Even if the state court's findings in that limited comparative analysis are entitled to the

24  presumption of correctness with respect to the prosecutor's reasons for striking Thompson,

25  a comparison of Thompson's responses with those of the non-stricken jurors who

26  expressed stronger views against the death penalty reveals the implausibility of the

27  prosecutor's proffered reasons.

28

United States District Court
For the Northern District of California

1    In challenging the prosecutor's reason for striking Thompson, that there were many

2    more jurors after Thompson who were much more pro-death penalty, Sifuentes identifies

3    six seated jurors who indicated on their questionnaires that they were "neutral" and

4    therefore less in favor of the death penalty than Thompson, who indicated that he was

5    "moderately in favor" of the death penalty: Juror Nos. 1, 2, 3, 4, and 12, who were called

6    before Thompson,[2] and Juror No. 5, who was called after Thompson.  Traverse at 17-18.

7    *See* RT 8924-65.  Of the seated jurors, only Juror No. 10 indicated that he was "strongly in

8    favor" of the death penalty; that is, only *one* seated juror indicated that he was more pro-

9    death penalty than Thompson.[3]

10    A close review of the record shows that Juror No. 10 was seated immediately after

11    Thompson was stricken, and 20 more prospective jurors were called into the jury box and

12    excused before Juror No. 5 was seated, completing the jury before alternates were called.

13    RT 8952-65.  Of those 20 prospective jurors, defense counsel exercised peremptory strikes

14    against 10 jurors, only 3 of whom indicated in their questionnaires that they were "strongly

15    in favor" of the death penalty.  Supp. Ex. 3, Vols. 2, 3.  Although the prosecutor's

16    explanation, that there were "many more" prospects who had stronger pro-death penalty

17    views than Thompson, appears exaggerated in light of this record, it does not, standing

18    alone, support a strong inference of pretext for striking Thompson.  When considered in the

19    context of other jurors' responses about the death penalty, however, the prosecutor's

20    statement that he sought jurors who were "much more pro-death penalty" than Thompson

21    is not credible.

22    Regarding Thompson's equivocation as a basis for the strike, when asked during

23    voir dire whether they could impose the death penalty, eight of the seated jurors and

24    _____

25    [2]    Juror Nos. 1, 2, 3, 4, 6, 7, 8, 9, 11 and 12 were seated before Thompson was
      called into the jury box and stricken by the prosecutor.  RT 8950.  Juror Nos. 10 and 5 and
26    the alternates were called after Thompson was stricken.  RT 8950-65.

27    [3]    Similar to Thompson, Juror Nos. 6, 7, 8, 9, and 11 and Alternate Jurors 1, 2,
      3, and 4 were "moderately in favor" of the death penalty.  Supp. Ex. 7, Vol. 1.  Alternate No.
28    5 indicated that she was neutral about the death penalty.  Supp. Ex. 7, Vol. 2.  Sifuentes
      has identified Juror No. 4 and Alternate No. 5 as the only two African-Americans in the
      bullpen.  Traverse at 7.

United States District Court

For the Northern District of California

alternates gave answers similar to Thompson's response that it was "hard to say" whether non-shooters would be eligible for the death penalty and that it would depend on the evidence:

- Juror No. 1 stated, "Under certain circumstances, I believe I could" vote to execute someone.  RT 6050.

- When asked if he could ever vote to execute another human being, Juror No. 2 stated, "I've never been in that situation.  I guess the only way I can answer that question is I would have to listen to all of the facts . . . .  RT 5121.

- Juror No. 5 said, "I don't know, honestly.  I didn't even really think about it until I came here the first time. . . .  And since then I've thought about it and I don't know. . . .  I think it would have to do with the situation."  RT 8296-97.

- Juror No. 9 said, "Possibly if – depending on the circumstances."  RT 3863.

- When asked by the trial judge if she could ever vote to execute another human being, Juror No. 11 answered, "I believe so, yes."  RT 6749.  When asked a similar question by the prosecutor, she further qualified her response: "But, since I've never done it before, I - I think I would be objective and, you know, decide with my heart or my head, or you know, but I can't tell you for sure that I would."  RT 6761.

- Juror No. 12 stated, "I believe I can" vote to execute another human being. RT 4758.

- Alternate No. 1 answered, "I think I probably could, depending on the circumstances."  RT 5592.  When the prosecutor asked Alternate No. 1 about his statement in his questionnaire that "I'm not opposed to it, I'm not strongly in favor of it," he explained, "I think what I was thinking at the time, if the – if I feel the death penalty is warranted by the action, I would vote for it.  I'm not crazy about assigning the death penalty for anybody.  I don't think that's a great thing to be proud of doing.  But if it's deserved, I would be willing to do that."  RT 5603.

1    •    Alternate No. 2 answered, "I think so."  RT 6416.  In response to the

2         prosecutor's further questions about whether he would be able to vote for the

3         death penalty, Alternate No. 2 responded, "I think if everything was

4         convincing, I would, yes," and "I would say there's a possibility that could be

5         my decision.  RT 6430.

6    To the extent that Thompson's stated views about the death penalty can be said to have

7    been equivocal, this comparative analysis shows that the responses of nearly half of the

8    empaneled jurors and alternates were similarly equivocal, expressing some level of

9    uncertainty as to whether they could impose the death penalty and indicating that it would

10   depend on the evidence.  In light of the evidence in the record, the state court's finding that

11   Thompson's views about the death penalty were equivocal, and that the equivocation was

12   a credible reason for the strike, is unreasonable.  Additionally, a comparative juror analysis

13   demonstrates that the prosecutor did not consistently strike jurors who had similarly

14   moderate views in favor of, or even neutral views about, the death penalty.

15                    **b.    Religious Beliefs**

16        With respect to Thompson's religious beliefs as a basis for the strike, the state court

17   found credible the prosecutor's stated reason that Thompson "was active in the Baptist

18   church, expressed extreme reservations about the death penalty, and while [Thompson]

19   understood his duty to follow the law, his religious beliefs prevented him from passing

20   judgment on another person."  Slip op. at 5.  The state court did not conduct a comparative

21   juror analysis addressing religious beliefs, as it did with views about the death penalty,

22   thereby failing to use "an important tool that courts should utilize on appeal when assessing

23   a defendant's plausible *Batson* claim."  *Boyd v. Newland*, 467 F.3d 1139, 1150 (9th Cir.

24   2006).  Here, the record includes the voir dire transcript, enabling the court to conduct a de

25   novo comparative juror analysis to determine whether the state court's ruling at the third

26   *Batson* step was unreasonable.  *See Green v. LaMarque*, 532 F.3d 1028, 1031 (9th Cir.

27   2008), *as amended* ("We must conduct that analysis de novo, rather than remanding for the

28   state courts to do so.").

**United States District Court**
For the Northern District of California

During the prosecutor's voir dire examination, Thompson stated the following about his religious beliefs:

> Q.  You said to the judge that you were taught to follow the law. Could you elaborate a little bit about what kind of upbringing you had that led you to that?
>
> A.  Well, I am a minister, I am faith based, I am a Christian, and in some religious aspects, they try to tell you that you are not supposed to judge anyone, that we don't have the right to judge anyone, but at the same time, you are also taught to obey the laws of the land. So basically I can't hold judgment on anyone, but at the same time I do have to hold to account what the laws of the land are.
>
> Q.  Did you say you're a minister in your religion?
>
> A.  Yes.
>
> Q.  And you said that your religious beliefs teach you to not judge other people.
>
> A.  Right. But at the same time, it also teaches us to obey the laws of the land. What I mean by not judge people, the Bible says that you are not to judge one another, but at the same time it tells you in there to obey the laws of the land.
>
> Q.  The function that you're going to be put into here is a little bit different than in most criminal cases in the sense that you're going to be asked to make a judgment about somebody, about their lives.
>
> A.  Um-hum.
>
> Q.  Are you saying that your religious beliefs are such that it's going to be a difficult –
>
> A.  No. It's not going to be a difficult problem, no.
>
> Q.  Why not? If your religious beliefs tell you not to judge people and you're going to be placed in a moral position to make a judgment about somebody, I'm trying to reconcile those two.
>
> A.  Well, the reconciliation is the fact that it's my job to carry out the laws of the land. Okay? No, I can't per se condemn someone, because everyone has shortfalls, everyone has things they have done in their past or whatever. I can't just say you're a bad person just because you did this, that, that. What I'm saying is that even after everything is taken into account, the laws of the land still prevail.
>
> THE COURT:  It's like the Bible says: Render unto Caesar that which is Caesar's, render unto God that which is God's.
>
> THE PROSPECTIVE JUROR:  Exactly.

United States District Court

For the Northern District of California

1

2

THE COURT:          We're talking about Caesar's rules here now,
                    right?

3

THE PROSPECTIVE JUROR:      Exactly.

4

THE COURT:          Okay.

5

. . .

6

Q.     How do you feel about that principle, just as a person?  Not as
       a – as something that's part of the law, but just you as a
       person and knowing your background as a minister in your
       religion, that sort of thing.

7

8

9

10

11

A.     Well, the principle in itself, I mean, should I be held
       accountable, should I be – how should I put it?  – lumped in or
       grouped with someone who does something wrong.  Well, if I
       know the individual, I'm caught, I'm caught.  I mean, the
       principle is basically what it is.  It's really not how I feel about
       it.  It's not like it's either right or either wrong.  The fact I was
       somewhere where I shouldn't have been.

12

RT 7397-7404.  At the conclusion of Thompson's voir dire examination, the prosecutor

13

challenged him for cause based on Thompson's answer that he can't judge people.  The

14

court overruled the prosecutor's challenge, noting that "[h]e said depending on the

15

circumstances."  RT 7404.

16

The prosecutor subsequently exercised a peremptory challenge against Thompson,

17

characterizing Thompson's voir dire statements as indicating that Thompson was not in a

18

position to hold anyone in judgment because of his religious beliefs.  As the trial judge

19

noted, however, Thompson considered the death penalty as an option, and separated his

20

belief that he could not morally judge others from his civic duty to make a legal judgment or

21

conclusion.  RT 7404.  Thompson's responses to the prosecutor's voir dire questions do

22

not support the state court's finding that the prosecutor was credible in claiming that he

23

struck Thompson because he was a Baptist minister and could not hold judgment on

24

anyone.  RT 8971.  *See Ali*, 584 F.3d at 1192 (the prosecutor's mischaracterization of

25

juror's "Christian faith" response was indicative of pretext).

26

Furthermore, to the extent that the prosecutor was concerned that Thompson's

27

religious background would affect his beliefs about the death penalty, a comparative

28

1 analysis shows that the prosecutor did not ask other potential jurors who identified

2 themselves as Baptist about their religious views:

3     •    B. Seibel listed her religious affiliation as Baptist, though not active. Supp.

4          Ex. 3, Vol. 1 (Seibel questionnaire at 6). The prosecutor did not ask her

5          during voir dire about her religious beliefs or how they would affect her views

6          on the death penalty. RT 4927-34. Seibel was excused by defendant Le. RT

7          8937.

8     •    M. Markey listed her religion as American Baptist, though not active. Supp.

9          Ex. 3, Vol. 3 (Markey questionnaire at 6). The prosecutor did not ask her

10          during voir dire about whether her religious beliefs would affect her views on

11          the death penalty. RT 6719-26. Markey was excused by defendant Le. RT

12          8960.

13       Although Seibel and Markey can be distinguished from Thompson, a minister,

14 because they were not active in their religious affiliations, they both indicated in their

15 questionnaires that they, like Thompson, were moderately in favor of the death penalty.

16 The record of the voir dire proceedings demonstrates that even though neither Seibel nor

17 Markey were empaneled, the prosecutor was not even interested in whether Seibel's

18 Baptist affiliation, or Markey's American Baptist affiliation, would affect their views on the

19 death penalty.

20       Similarly, the prosecutor was willing to accept Juror Nos. 2, 3, 10 and 11, who

21 identified themselves as Catholic, without questioning them about whether their religious

22 beliefs would affect their views on the death penalty. *See* RT 5129-37 (voir dire of Juror

23 No. 2); RT 4033-42 (voir dire of Juror No. 3); RT 6757-66 (voir dire of Juror No. 11). In

24 particular, Juror No. 10 identified his Catholic affiliation as active, yet the prosecutor did not

25 ask him whether his religious beliefs affected his attitudes about the death penalty. RT

26 4195-4201. Notably, the prosecutor extensively questioned a prospective juror who

27 identified herself as active in her Catholic affiliation and stated her belief that "life is sacred."

28 RT 6688-93 (voir dire of S. Lee). That prospective juror was excused by defendant Le. RT

United States District Court

For the Northern District of California

1   8964.  The record also demonstrates that the prosecutor briefly questioned two African-

2   American prospective jurors, R. Gibson and G. Norman, about their religious beliefs.  RT

3   6992-93, 8792-96.   Notwithstanding these particular exchanges with venire members, the

4   prosecutor for the most part did not pursue the stated religious beliefs of several of the

5   empaneled jurors.  The evidence thus tends to show that the prosecutor's stated reason for

6   striking Thompson because he was a Baptist minister appears to be pretextual.  The state

7   court's determination that the prosecutor struck Thompson for proper, race-neutral reasons

8   is unreasonable in light of the record.

9                            **2.    R. Gibson**

10      R. Gibson was a law school graduate and an inactive member of the state bar who

11  worked for the Menlo Park Police Department before joining SBC Pacific Bell, where she

12  worked for 19 years.  The prosecutor gave a number of reasons for dismissing Gibson, two

13  of which are not persuasive in light of the evidence in the record, namely, Gibson's past

14  work as a substitute teacher and her views about the death penalty.  Where the prosecutor

15  gave both legitimate and illegitimate grounds for striking Gibson, the court must determine

16  whether the prosecutor's actions were "'motivated in substantial part' by race." *Crittenden*

17  *v. Ayers*, 624 F.3d 943, 958 (9th Cir. 2010) (citing *Cook*, 593 F.3d at 815).

18                           **a.    Single Mother**

19      The prosecutor first noted that Gibson had a child when she was 16 years old and

20  that "I find that a problem."  RT 8975.  Sifuentes argues that the prosecutor implied that

21  having a child out of wedlock indicated general irresponsibility, as he found with other

22  African-American single mothers, and that this reason was not credible in light of Gibson's

23  accomplishments as a member of the bar with a successful career.  Traverse at 25.

24  Although Gibson's education and long term employment, notwithstanding she had been a

25  teenage mother, suggest anything but "irresponsibility," Sifuentes has not demonstrated

26  that Gibson was treated differently from non-African-American single mothers, or that

27  discriminatory intent is "inherent in the prosecutor's explanation." *Boyde v. Brown*, 404

28

United States District Court

For the Northern District of California

1    F.3d 1159, 1171, *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005) (citation and internal

2    quotation marks omitted).

3                                    **b.        Legal Education**

4          The prosecutor also explained, "I don't want a lawyer on my jury.  I've never liked

5    having lawyers on juries.  They're know-it-alls, they inject themselves into the case, they

6    think they can do a better job."  RT 8976.  The state court found this reason to be credible,

7    citing authority under state law that a prosecutor may peremptorily strike a potential juror

8    who has "*too much education.*"  Slip op. at 13 (quoting *People v. Reynoso*, 31 Cal. 4th 903,

9    925 n.6 (2003)).  To support his argument that this was a pretext for discriminating on the

10   basis of race, Sifuentes identifies two seated jurors who also had high levels of education:

11   Juror No. 9 who graduated from the Massachusetts Institute of Technology, and Juror No.

12   6 who had legal training at the college level.  Traverse at 26.  However, neither of those

13   jurors graduated from law school or were members of the bar, and therefore were not

14   similarly situated with Gibson for the purpose of comparative juror analysis.  Although

15   Sifuentes argues that Gibson had never practiced law, it is undisputed that she had formal

16   legal training and had passed the bar exam and was a member of the bar.  The state

17   court's finding, that the prosecutor's reason for dismissing Gibson because she was a

18   lawyer was race-neutral, is reasonable in light of the record.

19                               **c.        Relatives With Criminal History**

20         Another reason stated by the prosecutor for dismissing Gibson was that "she had

21   numerous relatives that have served time in the penitentiary," noting "a lot of the criminal

22   element in her family" and citing her questionnaire where she wrote that her brother served

23   time in the penitentiary in the late 1960's, her son served time in Santa Rita on drug

24   charges, and she had brothers-in-law and cousins who served time.  RT 8976; Gibson

25   Questionnaire at 7.  Sifuentes points out that Gibson thought that her brother and her son

26   were fairly treated by the system, but concedes that "any given prosecutor might decide to

27   strike prospective jurors related to persons with criminal histories," absent pretext.

28   Traverse at 27 (citing RT 6996).

United States District Court

For the Northern District of California

1    Sifuentes contends that this facially race-neutral reason was pretextual in light of

2  evidence that the prosecutor accepted other jurors who also had family members with

3  criminal histories: Juror No. 2, whose son was convicted of a drug offense and placed on

4  probation; Juror No. 3, whose father was involved in some cases involving power of

5  attorney problems in business; Juror No. 4, whose brother was convicted of rape; Juror No.

6  5, whose cousin was convicted of rape; Juror No. 8, whose daughter-in-law's father was

7  convicted of child molestation; Juror No. 12, whose brother was charged with felony

8  assault, which was dropped to a misdemeanor; and Alternate Juror No. 3, whose uncle was

9  convicted of a drug offense.  Traverse at 27-28; Supp. Ex. 7, Vol. 1.  The state court

10  distinguished the seated jurors from Gibson on the ground that none had relatives who had

11  served time in the penitentiary.  Slip op. at 14.  Although Sifuentes argues that comparable

12  jurors need not be comparable in every respect, the record demonstrates that the seated

13  jurors who each had a relative with a criminal history did not have multiple relatives who

14  had criminal histories, as did Gibson.  The state court's determination, that the prosecutor

15  gave a credible reason for striking Gibson because she had "numerous relatives" with

16  criminal histories, was not clearly unreasonable in light of this record.

17                    **d.     Nonresponsive Answers**

18    As another reason for striking Gibson, the prosecutor stated, "When asked about the

19  felony murder rule, she wouldn't directly answer the question about how she felt about it;

20  she dodged it."  RT 8977.  During voir dire, when asked whether she agreed with the

21  concept of the felony murder rule and whether she would support that law, she answered,

22  "Well, that, you know, I don't know.  I never aspired to be a legislator, so I don't know.  I

23  mean I can't tell you. . . . I can understand why we would have that type of a law. . . . So I

24  can't say that I have a philosophical difference with it."  RT 6994.  The state court

25  determined that in light of her legal training, the questioning of Gibson about the felony

26  murder rule did not support a finding of pretext, slip op. at 14, and Sifuentes does not raise

27  any argument as to whether this reason given by the prosecutor for striking Gibson was

28  pretextual.  In light of the voir dire transcript reflecting Gibson's responses to the

United States District Court

For the Northern District of California

1   prosecutor's questions whether she thought the felony murder rule was fair, it was not

2   clearly unreasonable for the state court to find that the prosecutor's concern with her

3   nonresponsive answers was non-pretextual.  *See* RT 6993-95.

4                  **e.      Views About the Death Penalty and Religious Beliefs**

5          The prosecutor further stated that Gibson was dismissed because she said "when

6   she was younger she never thought the death penalty should be an available option

7   because she didn't think that anyone had the right or authority to impose death."  RT 8976.

8   Gibson explained during voir dire that when she was younger, she "never thought that the

9   death penalty should be a viable option, because I didn't think that anyone had that right or

10  authority to impose that upon another person, even though someone could murder a

11  person and, in essence, that's the death penalty.  But for a jury to then turn around and

12  decide that the defendant should die, I never thought that was quite right. . . . Really what's

13  changed is that I'm actually a Christian and Christian principles, the death penalty is a

14  viable option.  And so I would say that's really what changed my views."  RT 6992.

15         The prosecutor also noted that Gibson said that she was a born-again Christian and

16  her Christian beliefs would influence the way she thinks.  RT 8977.  However, the voir dire

17  transcript reflects that her Christian beliefs changed her views about the death penalty to

18  accept it as a viable option, rather than influencing her against the death penalty.  RT 6992-

19  93, 7004-06.  The prosecutor expressed his concern that Gibson stated that she could

20  "consider" the death penalty, indicating "[t]hat doesn't mean it's really on the table."  RT

21  8977.  Read in the context of the rest of the transcript, however, Gibson's voir dire

22  response indicated that she "became more conservative" as she got older, and that

23  Christianity allows for the death penalty "if you have the evidence and you have witnesses,"

24  so that she would now "really consider" the death penalty, as opposed to when she was

25  younger.  RT 7005.  In light of this evidence, the state court's finding, that the prosecutor

26  was "uncomfortable" with her answers and credibly relied on Gibson's religious beliefs and

27  changing views about the death penalty to dismiss her, is clearly unreasonable in light of

28  the absence of any evidentiary record suggesting that she was being untruthful.

United States District Court

For the Northern District of California

1

### f.    Teaching Background

2    The prosecutor also stated that Gibson was a school teacher in 1992 to 1995, which

3    he reasoned indicated that she was "fairly liberal."  RT 8975-76.  Respondent concedes

4    that Gibson's teaching experience was brief and limited to substitute teaching.  Answer at

5    19.  To show that this was a pretextual reason for striking Gibson, Sifuentes argues that the

6    prosecutor "accepted two full-time, life-long teachers": Juror No. 8 previously taught

7    elementary school before her current position as a curriculum coordinator, and Alternate

8    Juror No. 1 was a retired teacher who taught high school and college for a total 52 years.

9    Supp. Ex. 7, Vol. 1; RT 8052.  In light of this comparative juror analysis, Sifuentes has

10   demonstrated that Gibson's prior teaching experience, with its suggestion of liberality, was

11   not a credible reason for dismissing her.

12

### 3.    *Batson* Analysis

13

### a.    Thompson

14   As the court of appeals held in *Ali*, where "an evaluation of the voir dire transcript

15   and juror questionnaires clearly and convincingly refutes each of the prosecutor's nonracial

16   grounds" for striking Thompson, the court is "compelled to conclude that his actual and only

17   reason for striking [Thompson] was [his] race."  584 F.3d at 1182.  Thompson's stated

18   views about the death penalty, as well as comparative juror analysis, reflect that the

19   prosecutor's stated reasons for striking Thompson due to his religious beliefs, his equivocal

20   views on the death penalty, and the availability of more pro-death penalty jurors appear to

21   have been pretextual.  The proffer of only one pretextual explanation "naturally gives rise to

22   an inference of discriminatory intent," and here, as in *Ali*, an analysis of the "totality of the

23   relevant facts" refutes each of the prosecutor's non-racial justifications for striking

24   Thompson.  584 F.3d at 1192-93.

25   In particular, the prosecutor mischaracterized Thompson's statements about his

26   views on the death penalty and how his religious beliefs would affect his ability to vote for

27   the death penalty.  Under Ninth Circuit authority, the court is compelled to find that the state

28   court, having failed to recognize that the prosecutor mischaracterized Thompson's

United States District Court

For the Northern District of California

1    statements, and having failed to consider comparative evidence that the prosecutor did not

2    question seated jurors about whether their stated religious beliefs impacted their views on

3    the death penalty, "'unreasonably accepted his nonracial motives as genuine.'" *Ali*, 584

4    F.3d at 1193 (quoting *Kesser*, 465 F.3d at 358).  *See Miller-El II*, 545 U.S. at 244, 246-47

5    (state court's determination that the prosecutor gave credible race-neutral explanations for

6    using peremptory strike against African-American venire member was unreasonable where

7    the state court "made no mention of the fact that the prosecution mischaracterized Fields

8    as saying he could not give death if rehabilitation were possible," despite evidence that he

9    "unequivocally stated that he could impose the death penalty regardless of the possibility of

10   rehabilitation").  As "'[t]he Constitution forbids striking even a single prospective juror for a

11   discriminatory purpose,'" Sifuentes is entitled to habeas relief under *Batson*.  *Ali*, 584 F.3d

12   at 1193 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)) (internal citation omitted).

13                          **b.      Gibson**

14           Although a *Batson* violation is established solely by the finding compelled by the

15   record that the prosecutor's removal of Thompson was racially motivated, the court also

16   evaluates the prosecutor's stated reasons for striking Gibson, as an alternative ground for

17   *Batson* relief.  Here, as in *Cook*, the court is faced with a close question, whether the

18   prosecutor was motivated in substantial part by discriminatory intent, where several race-

19   neutral justifications for striking Gibson were persuasive and unrefuted by the record, but

20   two other reasons given by the prosecutor provide evidence of pretext, i.e., Gibson's views

21   about the death penalty and her past work as a substitute teacher.  *See Cook*, 593 F.3d at

22   816-19.  In *Cook*, the Ninth Circuit rejected the mixed-motives analysis adopted by other

23   circuits, by which the court conducts a supplemental analysis to determine whether the

24   discriminatory motivation was a "but for" cause of the challenged decision.  *Id.* at 814 (citing

25   *Kesser*, 465 F.3d at 359).  The court in *Cook* held instead that the court's inquiry was

26   limited to whether the prosecutor was "motivated in substantial part by discriminatory

27   intent."  *Id.* at 814-15 (citing *Snyder*, 552 U.S. at 485).  If it was so motivated, *Batson* relief

28   is warranted: "'*it is enough to recognize that a peremptory strike shown to have been*

1    *motivated in substantial part by discriminatory intent* could not be sustained based on any

2    lesser showing by the prosecution.'"  *Id.* at 815 (quoting *Snyder*, 552 U.S. at 485).  *See*

3    *Crittenden*, 624 F.3d at 958 (if the peremptory strike was "'motivated in substantial part' by

4    race[,] the petition is to be granted regardless of whether the strike would have issued if

5    race had played no role") (quoting *Cook*, 593 F.3d at 815).

6         In *Cook*, the prosecutor's two primary motivations for striking an African-American

7    juror (Watkins) were that she reported that her brother "shot someone in self-defense,"

8    where the brother had actually been the perpetrator and was convicted and imprisoned for

9    the crime, and that she perceived problems with the criminal justice system, particularly

10   where Watkins said her family felt that her brother's treatment had been unfair.  593 F.3d at

11   816-17.  The court of appeals held that these justifications were "quite persuasive and are

12   unrefuted by the record.  Had he stopped talking after giving his first two justifications, this

13   strike would be exceptionally easy to review."  *Id.* at 819.  The court further held that the

14   prosecutor also gave weaker and implausible justifications by mischaracterizing the juror's

15   opinion about the truthfulness of police testimony, and by citing her "work pressures" from

16   sitting on a long case where two seated jurors gave similar responses.  *Id.* at 818.  The

17   court concluded that "[c]areful review of the record ultimately supports the conclusion that

18   the prosecutor was sincerely and justifiably concerned with Watkins' views of, and her

19   brother's experience with, the criminal justice system."  *Id.* at 819.

20        Here, the prosecutor mischaracterized Gibson's statements about her views on the

21   death penalty, particularly by implying that her religious beliefs would influence her against

22   voting for the death penalty, whereas the record indicates that she was willing to consider

23   the death penalty and that she indicated in her questionnaire that she was moderately in

24   favor of the death penalty.  The prosecutor also reached back nearly 20 years to cite

25   Gibson's three-year experience as a substitute teacher to strike her as "fairly liberal," when

26   he accepted two jurors who were teachers for much longer and more recent periods.

27   These reasons are not merely implausible, but are pretextual in light of the evidence in the

28   record.

United States District Court

For the Northern District of California

1    Respondent contends that the record as a whole supports the state court's finding

2   that the prosecutor was credible and was not motivated by discriminatory intent in

3   dismissing Gibson.  Answer at 19.  The state court primarily addressed the prosecutor's

4   concerns that Gibson was a lawyer and that she had close relatives who were convicted of

5   a crime and incarcerated.  Slip op. at 13.  These justifications, standing alone, are

6   supported by evidence in the record.  However, when considered in light of the non-

7   credible reasons given by the prosecutor for dismissing Gibson, the record demonstrates

8   that the prosecutor was not sincerely and justifiably concerned either with Gibson's legal

9   training, where she had never practiced law, or with the effect of her brother and her son's

10  incarceration on her views about the criminal justice system, where she stated that she felt

11  they were treated fairly.  By contrast, in *Cook*, the court held that the prosecutor was

12  motivated by valid concerns where the juror in question misrepresented that her brother

13  was a victim of a crime, when he actually was the perpetrator and unsuccessfully claimed

14  self-defense, and the juror's family felt the result had been unfair.  *Cook*, 593 F.3d at 816.

15    The prosecutor articulated two secondary reasons for dismissing Gibson, namely,

16  that she was a single mother and did not directly answer his questions about her views on

17  the felony murder rule.  Neither justification is refuted by the record, but neither reason was

18  the primary motivation for dismissing Gibson.  In the last reasoned decision denying

19  Sifuentes's *Batson* claim, the court of appeal did not discuss Gibson's status as a single

20  mother.  When addressing the defendants' challenge to the prosecutor's questions about

21  the felony murder rule to Gibson as compared with other jurors, the state court found that

22  none of the other jurors had attended law school or had relatives who served time in the

23  penitentiary.  Slip op. at 14.  The state court thus recognized Gibson's legal training and

24  family members' incarceration as the prosecutor's primary motivations for striking Gibson.

25  However, the prosecutor's mischaracterization of Gibson's views about the death penalty,

26  and his inconsistent treatment of non-African-American jurors who were teachers, strongly

27  suggest that the peremptory strike against Gibson was motivated in substantial part by

28  discriminatory intent.  Even under AEDPA's deferential standard of review, the state court

**United States District Court**
For the Northern District of California

1    was objectively unreasonable in concluding that the prosecutor was not substantially

2    motivated by discriminatory intent in dismissing Gibson.

3         "The Constitution forbids striking even a single prospective juror for a discriminatory

4    purpose." *Ali*, 584 F.3d at 1193 (citation and internal quotation marks omitted).  Either of

5    the *Batson* violations with respect to Thompson or Gibson is sufficient to establish a basis

6    to grant habeas relief, and further consideration of the remaining challenges is not required.

7    *See Turner v. Marshall*, 121 F.3d 1248, 1255 n.4 (9th Cir. 1997).  However, in the event

8    that the appellate court disagrees with the *Batson* analysis, and to avoid the necessity of

9    remand to complete the record on the remaining claims, the court proceeds to consider

10   Sifuentes's *Batson* challenges to the use of peremptory strikes against seven other African-

11   American prospective jurors.  None of these remaining *Batson* challenges, however,

12   establishes a further basis for relief.

13        **D.     Other Peremptory Strikes**

14             **1.     T. Jackson**

15        The prosecutor exercised his first peremptory strike to excuse T. Jackson, explaining

16   that Jackson lived in Berkeley, which he called a "hotbed of anti-death penalty people," and

17   that Jackson was reluctant to impose the death penalty.  RT 8929.  The prosecutor

18   reviewed Jackson's questionnaire and statements during voir dire.

19                    In his questionnaire, he indicated on his feelings about the
                 death penalty, "I am still thinking about it."  His views have changed.
20               He said, "As more and more new methods of investigation show the
                 old flaws, I am becoming less inclined towards the death penalty."
21
                      He also indicated in his questionnaire that he has problems
22               with the system with respect to the fairness of the death penalty.  In
                 his transcript, at pages 4223 and 4224, he right up front to the court
23               said, on line 24 at 4223, "I have mixed emotions about the death
                 penalty in that I think, yeah, under some circumstances.  Depending
24               on what happened.  And at this point I think my real reservations
                 about the system itself, about the number of -- I think there are a fair
25               amount of innocent people who get the death penalty, so I have
                 problems with the process and the system."
26
                      And then later on he goes on to say, when the judge is asking
27               him about if you weren't convinced the three guys were guilty, lines
                 13 and 14, "We would never get to a penalty phase.  Does that give
28               you any comfort?"  He says, "Some.  But then that brings up another
                 question, which is, when you're a member of a jury, there's peer

pressure from a group.  I have high principles, I'm a pretty strong guy and outspoken, but, still, you could" -- [Statement by trial judge]

He goes on to say, on page 4225, when the court is asking him about the two different penalties again, he says, "I would have fewer problems with that than I would with the death penalty," referring to life without the possibility of parole.

And then he says – the court says, "As you sit there now, if you know that the death penalty is in no way an option for you, this guy could stand here six years and never persuade you that the death penalty is an option."  He says, "No."  "And then you're wasting his time."  The answer from the juror: "Yeah.  No, it would be an option.  It would be an option.  I would not be an easy sell, but it would be an option."

So he's already expressing reluctance to impose the death penalty.

. . . In direct response to questions that I was asking him, he was basically requiring me to provide information that I'm not allowed to produce, which is basically. . .

"My reservations still would be, is it being applied fairly.  That would be my reservation: are the investigation methods that we really use good enough," page 4239, "is the political system good enough, can poor people get the same kind of representation that rich people get, et cetera.  That would be my reservation."

"As the judge pointed out, that's a general whatever.  It's going to be your job," referring to me, "to persuade me that all the reservations that I have, all of the apprehensions that I have, that they don't apply in this particular case.  And if you do that, I have no reservations about anything."

RT 8929-30.  The trial court determined that the prosecutor's explanation for striking Jackson was race-neutral.  RT 8932.

### a.   Views on Death Penalty

The state court considered Sifuentes' argument that the prosecutor's reference to Jackson's residence in Berkeley as a "hotbed of anti-death-penalty people" was pretextual because Jackson's background had other pro-prosecution characteristics, such as being a retired trucker, a member of Neighborhood Watch, and a pistol owner.  The state court found that Jackson's background did not dictate his views on the death penalty, which he articulated in his questionnaire and during voir dire.  Slip op. at 6-7.

The state court further addressed Sifuentes's comparison of Jackson with Juror No. 6, who graduated from the University of California at Berkeley.  The state court found that

30

United States District Court
For the Northern District of California

1   Juror No. 6 lived in Castro Valley, not Berkeley, and was in favor of the death penalty. This

2   finding is supported by the record, which shows that Juror No. 6 graduated from UC-

3   Berkeley with a degree in mechanical engineering, and was married with one child and

4   owned a home in Castro Valley. Supp. Ex. 7 at 77-80. The record also shows that Juror

5   No. 6 stated on her questionnaire that she was moderately in favor of the death penalty,

6   and that her views had not changed in the last few years. Supp. Ex. 7 at 87. By contrast,

7   the state court found that Jackson expressed reservations about the death penalty in his

8   questionnaire and during voir dire. Slip op. at 6-7 (citing transcript of voir dire colloquy).

9       Sifuentes argues that Jackson's questionnaire responses, indicating that he was

10  "becoming less inclined towards the death penalty" "as more and more new methods of

11  investigation show the old flaws," were similar to the views of Juror No. 7, who stated in her

12  questionnaire that her views about the death penalty had changed in the last few years

13  "slightly - due to the number of inmates released due to DNA evidence proving their

14  innocence." Reply at 54-55. *See* Supp. Ex. 3 Vol. 1 (Jackson questionnaire); Supp. Ex. 7

15  at 109 (Juror No. 7 questionnaire). The state court determined that this comparison to

16  Juror No. 7 did not demonstrate that the prosecutor's proffered explanation for striking

17  Jackson, because of his views on the death penalty, was pretextual. The state court found

18  that unlike Jackson, Juror No. 7 "also indicated on her questionnaire that she would vote for

19  the death penalty if it was on the ballot and that she was moderately in favor of the death

20  penalty." Slip op. at 7 n.2.

21      In light of the evidence presented in the state court proceeding, the state court's

22  finding that the prosecutor did not engage in purposeful discrimination was not objectively

23  unreasonable.

24                      **b.      Mistaken Reason**

25      In giving his reasons for challenging Jackson, the prosecutor erroneously attributed

26  statements to Jackson that were actually made by another excused juror, A. Jaspar. RT

27  8931. Jasper, not Jackson, wrote in her questionnaire, "I don't know if I can consciously

28  end someone's life," and stated in voir dire, "I don't know if I could live with thinking I

United States District Court
For the Northern District of California

1    basically killed this person."  Answer at 8-9; Supp. Ex. 3 Vol. 1 (Jaspar questionnaire); RT

2    4094.  The prosecutor also erred by stating that Jackson "indicated in his questionnaire that

3    he has problems with the system with respect to the fairness of the death penalty," and

4    respondent concedes that no such statement appears verbatim in Jackson's questionnaire.

5    Answer at 9 (citing RT 8929).  Sifuentes argues that the prosecutor's mistake in attributing

6    anti-death penalty comments erroneously to Jackson shows that the prosecutor thought of

7    the African-American prospective jurors as a discrete sub-group, and stereotyped their

8    views on the death penalty.  Reply at 53.

9           The state court considered the prosecutor's erroneous reliance on comments that

10   were not made by Jackson to exercise a peremptory strike against him, and found that

11   although "this exact statement about fairness does not appear in [Jackson's] questionnaire,

12   he did make a similar statement when he was voir dired by the court on the issue."  Slip op.

13   at 8 n.3.  Furthermore, the state court found that although Jackson did not make the same

14   comments as Jasper expressing hesitancy in imposing the death penalty, Jackson

15   "expressed other serious reservations about the death penalty.  Slip op. at 8 n.3.  The state

16   court concluded that the prosecutor's mistake in attributing Jasper's statements to Jackson

17   was insufficient to demonstrate discriminatory intent.

18          Under Ninth Circuit authority, "if a prosecutor makes a mistake in good faith, such as

19   an innocent transposition of juror information, then that mistake does not support the

20   conclusion that the prosecutor's explanation is clearly not credible."  *Aleman v. Uribe*, 723

21   F.3d 976, 982 (9th Cir. 2013), *as amended*, *pet. for cert. filed* (U.S. Sept. 12, 2013) (No. 13-

22   6391).  Here, the record supports the state court's finding that the prosecutor's mistake did

23   not indicate purposeful discrimination, in that Jackson stated in voir dire, but not in his

24   questionnaire, that he had "reservations" about whether the death penalty was "being

25   applied fairly."  RT 4239.  Jackson articulated his apprehensions about the death penalty at

26   length: "Are the investigation methods that we use really good enough, is the political

27   system good enough, can poor people get the same kind of representation that rich people

28   get, et cetera.  That would be my reservation."  *Id.*  In light of these statements made by

1   Jackson, it was reasonable for the state court to conclude that the prosecutor's mistakes,

2   including the erroneous attribution to Jackson of Ms. Jasper's concerns about ending

3   someone's life, was not a deliberate misrepresentation of Jackson's views, but was an

4   honest mistake.

5              2.       G. Norman

6        The prosecutor exercised his third peremptory strike against G. Norman.  At the

7   hearing on the defendants' first *Wheeler* motion, the prosecutor explained that in his

8   questionnaire and during voir dire, Norman "said that specifically he's not for the death

9   penalty, he would not be for it, he's got religious problems with the death penalty, if it was

10  up to him whether there would be the death penalty as a punishment in California, he would

11  say no, and that's based on a religious belief."  RT 8933.  The record supports the state

12  court's finding that this reason for striking Norman was not motivated by racial

13  discrimination.  During voir dire, Norman stated that "for the most part, I'm against the

14  death penalty" because he's Christian, attends church on a regular basis, and actually

15  "worked at juvenile hall with youngsters and I do know that over time that people change."

16  RT 8790.  Although Norman also stated that he could pick the death penalty "if I had to,"

17  RT 8795, the totality of his statements support the state court's finding that the prosecutor

18  gave a credible explanation for dismissing Norman because he was "philosophically

19  opposed to the death penalty."  RT 8933.  In light of the evidence of Norman's "conflicting

20  statements on the death penalty," the state court's finding was not unreasonable.  Slip op.

21  at 8.

22       Respondent also argues that the trial court and the prosecutor noted that Norman

23  failed to appear in court on two separate occasions.  Answer at 12 (citing RT 8933).

24  Sifuentes responds that the prosecutor could have asked Norman during voir dire about

25  why he was late or absent but failed to do so.  Traverse at 52.  This argument does not

26  render unreasonable the state court's determination that Norman's absence and tardiness

27  was a race-neutral reason to dismiss him.  *See Mitleider*, 391 F.3d at 1049 ("the

28

prosecutor's belief that [a potential juror's] tardiness was a sign of immaturity is a legitimate reason for his challenge, even if mistaken").

### 3.   A. Jasper

#### a.   Single Mother/Clothing Comments

To explain why he dismissed A. Jaspar, the prosecutor first explained that she was "a single mother with a six-year-old" who came to court "wearing leather pants, which I thought was interesting." RT 8934. Although Sifuentes objects to this characterization as an offensive stereotype about African-American females, Traverse at 30-31, *Batson* "'does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Purkett v. Elem*, 514 U.S. 765, 767-768 (1995) (per curiam)). The state court's determination that this reason for striking Jaspar was not motivated by discriminatory intent is not unreasonable.

#### b.   Views About Death Penalty

The prosecutor also stated that Jaspar wrote that she had "mixed feelings on whether or not killing someone is the right thing to do," and that "I don't know if I can consciously end someone's life." *Id.* During voir dire, she expressed, "I don't know if I could live with thinking I've basically killed this person. That's pretty tough." RT 4094-95. When questioned, she also stated that she could select the death penalty if she felt someone deserved it. RT 4096. In response to the prosecutor's voir dire questions, she said she had "mixed feelings," but that she could impose the death penalty "if it's justifiable." RT 4097-99.

Jaspar's statements expressing caution about imposing the death penalty are similar to the statements made by Thompson and Gibson that the prosecutor characterized as equivocal. But unlike Thompson and Gibson, who indicated in their questionnaires that they were moderately in favor of the death penalty, Jaspar marked that she was moderately against the death penalty. Further, Jaspar expressly wrote in her questionnaire that "I have mixed feelings on whether or not killing someone is the right thing to do." Supp. Ex. 3, Vol.

United States District Court

For the Northern District of California

1.   In light of the record of Jasper's voir dire and questionnaire, the state court reasonably found that Jasper's conflicting views on the death penalty constituted a race-neutral reason for the prosecutor to exercise a peremptory challenge against her.

### c.    Views About Criminal Justice System

Another reason given by the prosecutor for dismissing Jasper was her view that "the criminal justice system is biased towards those who do not have enough money to pay for a decent lawyer," and that her brother's friend was charged with murder.  RT 8934.  Sifuentes argues that the prosecutor did not strike non-African-American jurors who knew, or were related to, someone who had been charged with a crime: Juror No. 2, whose son was convicted of drug possession; Juror No. 3, whose father was involved in power of attorney problems; Juror No. 4, whose brother was charged with rape; Juror No. 5, whose cousin was convicted of gang rape; and Juror No. 8, whose daughter-in-law's father was convicted of child molestation.  Traverse at 36.  None of the seated jurors identified by Sifuentes knew someone who was charged with murder, and the prosecutor specifically expressed his concern that Jasper's familiarity with his brother's friend's murder case "will interfere with her ability to sit in a murder case."  RT 8934.  In light of this record, the state court's finding, that Jasper's views about the criminal justice system constituted a race-neutral justification to strike her, was not unreasonable.

### d.    Demeanor

The prosecutor also stated that Jasper was not very friendly to him.  RT 8934.  Sifuentes challenges the state court's failure to make specific findings with respect to this demeanor-based reason.  Traverse at 36.  Where the trial judge did not make a specific finding as to demeanor, there may be different reasons why the trial judge allowed the challenge without explanation, and the court sitting in habeas review "cannot presume that the trial judge credited the prosecutor's assertion" about the prospective juror's demeanor.  *Snyder*, 552 U.S. at 479 ("the trial judge may not have recalled Mr. Brooks' demeanor.  Or, the trial judge may have found it unnecessary to consider Mr. Brooks' demeanor, instead basing his ruling completely on the second proffered justification for the strike.").  Although

United States District Court

For the Northern District of California

1    the state court did not make a specific finding as to Jasper's demeanor that is entitled to

2    deference, Sifuentes cites no authority requiring the trial court to develop evidence in the

3    record to support a prosecutor's demeanor-based explanation.  In *Rice*, the Supreme Court

4    held that even if the trial court had reason to question the prosecutor's credibility regarding

5    a juror's alleged improper demeanor, that does not compel the conclusion that the trial

6    court had no permissible alternative but to reject the prosecutor's race-neutral justifications

7    and conclude that a *Batson* violation occurred.  *Rice*, 546 U.S. at 341.

8         In *Rice,* as a race-neutral explanation for striking a juror, the prosecutor said that the

9    juror had rolled her eyes in response to a question from the court, but also referred to that

10   juror's gender.  The trial court disallowed any gender-based challenge as a race-neutral

11   explanation, but because it did not see the eye-rolling, the trial court gave the prosecutor

12   the benefit of the doubt in allowing the juror to be stricken due to her demeanor, as well as

13   her youth and lack of ties to the community.  *Id.* at 336-37.  On habeas review, the Ninth

14   Circuit determined that the trial court unreasonably credited the prosecutor's justification for

15   a strike where the claimed negative demeanor was not corroborated by the record.  *Collins*

16   *v. Rice*, 348 F.3d 1082, 1095–96 (9th Cir. 2003), *rev'd*, 546 U.S. 333.  The Supreme Court

17   reversed, denying habeas relief on *Batson* grounds, holding that the trial court's factual

18   determination at step three was not unreasonable despite the failure to question the

19   prosecutor's credibility, where the prosecutor provided a number of other permissible and

20   plausible race-neutral reasons and the petitioner failed to demonstrate "that a reasonable

21   factfinder must conclude the prosecutor lied about the eye rolling and struck Juror 16 based

22   on her race."  *Rice*, 546 U.S. at 341.  "Reasonable minds reviewing the record might

23   disagree about the prosecutor's credibility, but on habeas review that does not suffice to

24   supersede the trial court's credibility determination."  *Id.* at 341-42.  Similarly, here, the trial

25   court's failure to question the prosecutor's credibility about Jasper's unfriendly demeanor

26   did not result in an unreasonable factual determination that the prosecutor was not

27   motivated by discriminatory intent, in light of the evidence in the record and the other race-

28   neutral reasons given by the prosecutor.

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### e.      Attitude About Career

Lastly, the prosecutor stated that Jasper indicated that "she didn't really care about actually going to work." RT 8934.  The record shows that when asked about employer hardship during voir dire, Jasper explained that her co-worker's maternity leave "really doesn't matter for me," referring to her ability to serve as a juror without risking her job.  RT 4085-86.  Sifuentes argues that the prosecutor mischaracterized Jasper's response to indicate a lack of interest in pursuing her career, and contends that this proffered reason was a pretext for a racially motivated challenge.  Traverse at 34-35.   The evidence in the record does not show, however, that, "even if this reason was mere pretext," the prosecutor was "motivated in substantial part by discriminatory intent," rather than Jasper's attitudes about the death penalty and opinions about the criminal justice system.  *Cook*, 593 F.3d at 815, 821 (holding that race-neutral reasons to strike African-American prospective juror were not pretextual, despite prosecutor's reference to race where he was concerned that the prospective juror saw himself as a victim of racial prejudice, which might translate into sympathy for the African American defendants) (citations omitted).

### 4.      K. Webster

### a.      Demeanor

To explain why he exercised a peremptory strike against K. Webster, the prosecutor stated, "he obviously didn't like me; he was very hostile and argumentative during the course of the questioning by me." RT 8944-45.  Respondent concedes that the prosecutor confused Webster with another prospective juror, K. Massey.  Answer at 14 and n.6.  Sifuentes argues that the prosecutor's transposition of juror information demonstrates that he held racial stereotypes, but Sifuentes fails to demonstrate that this was more than an honest mistake.  Traverse at 38.  *See Aleman*, 723 F.3d at 982.  The state court's determination that the prosecutor was not motivated by discriminatory intent is not unreasonable in light of the evidence in the record.  Furthermore, the state court noted that the record did not show that Webster was hostile or argumentative toward the prosecutor,

United States District Court

For the Northern District of California

1    but denied relief on the ground that Webster clearly expressed reservations about the

2    death penalty which justified the peremptory challenge.  Slip op. at 9-10.

3    **b.**    **Views About Death Penalty**

4          The prosecutor also stated that Webster indicated in both the questionnaire and

5    during voir dire that he hoped "some day it will be considered uncivilized," and that he

6    would vote against the death penalty, having "read too many stories about people wrongly

7    convicted."  RT 8945.  The evidence in the record supports the state court's finding that

8    Webster stated that it was "reasonably unlikely" that he would vote for the death penalty for

9    the defendants who were non-shooters, and that although he had not eliminated the death

10    penalty as an option, it would be "very difficult" to impose the death penalty for non-

11    shooters.  RT 6285-95.  The record also supports the state court's finding that Webster

12    opined that the death penalty was "uncivilized" and hoped that society would progress

13    beyond it "some day."  RT 6279.  The state court's finding that the prosecutor was not

14    motivated by discriminatory intent in striking Webster for this reason is not clearly

15    unreasonable in light of the record.

16    **c.**    **Depression and Religion**

17          The prosecutor's third reason for striking Webster was that he was treated for

18    depression in 1995, and that Webster believed his therapist helped him.  RT 8945.  The

19    prosecutor also mentioned that Webster was of the Baptist faith, but did not explain how

20    Webster's religious affiliation affected his views on the death penalty or otherwise

21    disqualified him.  RT 8945.  The record indicates that Webster identified his religious

22    affiliation as Baptist, Supp. Ex. 3, Vol. 2, but the voir dire transcript does not reflect that the

23    prosecutor even asked Webster about his religious views or their influence on his views of

24    the death penalty.  *See* RT 6288-96.  Unlike the prosecutor's mischaracterization of

25    Thompson and Gibson's statements about their religious views, the prosecutor's reference

26    to Webster's Baptist affiliation was made in passing and without deliberate

27    mischaracterization or focused inquiry.  While the prosecutor's explanation for striking

28    Webster because of his depression and religious affiliation may not appear "even

United States District Court

For the Northern District of California

1  plausible," these reasons are not "inherently discriminatory" so as to warrant relief under

2  *Batson*.  *Rice*, 546 U.S. at 338.

3  **d.      No Opportunity for Rebuttal**

4  Sifuentes argues that he was not afforded the opportunity to rebut the prosecutor's

5  proffered reasons for striking Webster and other African-American prospective jurors, to

6  demonstrate that they were pretextual.  Traverse at 42-47.  Respondent concedes that the

7  trial court did not allow the defense attorneys to provide rebuttal argument during the first

8  *Wheeler* motion (challenging the dismissal of Jackson, Norman and Jasper), and the record

9  reflects that the trial court also denied defense counsel the opportunity to argue pretext

10  after the second *Wheeler* motion was made and the prosecutor offered race-neutral

11  reasons to strike Webster and K. Massey.  RT 8948.  Respondent argues that the trial court

12  invited rebuttal argument for the third *Wheeler* motion (challenging the dismissal of

13  Thompson, Barnes, Scruggs and Gibson), after the prosecutor's reasons for dismissing all

14  the prospective jurors had been disclosed.  Answer at 21.  The record demonstrates,

15  however, that the trial judge stated that he "already denied the motion twice," and only

16  permitted defense counsel to make rebuttal argument with respect to the four prospective

17  jurors who were the subject of the third and final *Wheeler* motion: "the reasons for

18  Thompson, Barnes, Skruggs and Gibson."  RT 8977.

19  The state court held that the trial court erred in refusing to allow defense counsel to

20  rebut the prosecutor's proffered reasons before ruling on the *Batson/Wheeler* motions.  Slip

21  op. at 16.  The state court also held that the error was harmless under the *Chapman*

22  standard because the record fully supported "the trial court's findings that the prospective

23  African-American jurors were challenged for proper, race-neutral reasons."  *Id.* (citing

24  *Chapman v. California*, 386 U.S. 18, 24 (1967)) and *People v. Watson*, 46 Cal. 2d 818, 836

25  (1956)).  Sifuentes contends that the *Chapman* harmless error standard is also applicable

26  here on collateral review.  Traverse at 46-47.

27  On habeas review, the court must consider whether the trial court's error in refusing

28  to permit rebuttal argument during *Batson* proceedings was prejudicial under the *Brecht*

United States District Court

For the Northern District of California

1    harmless error standard, rather than the "harmless-beyond-a-reasonable-doubt standard"

2    required of state courts on direct review under *Chapman*. *See Ayala v. Wong*, 730 F.3d

3    831, 851 (9th Cir. 2013) (finding prejudicial error where defense was excluded from the

4    *Batson* proceedings) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Kotteakos v.*

5    *United States*, 328 U.S. 750, 776 (1946)), *pet. for reh'g en banc filed* Sept. 26, 2013.  In

6    *Ayala*, the court of appeals held that "[b]ecause the defense was excluded from the *Batson*

7    proceedings, it could not bring necessary facts and arguments to the attention of the trial

8    judge, the institutional actor best positioned to evaluate the prosecution's credibility and to

9    determine if its proffered reasons for striking the minority jurors were its actual and

10   legitimate reasons."  730 F.3d at 859.  The court in *Ayala* also found that prejudice was

11   caused by defense counsel's inability to preserve for the record, and possible appeal,

12   crucial facts bearing on the judge's decision, particularly where the jury questionnaires

13   were lost, and the court of appeals was unable to perform a comparative juror analysis.  *Id.*

14   at 852, 859.  The court in *Ayala* thus concluded that the petitioner was prejudiced in his

15   ability to prevail on his *Batson* claim by the fact that his counsel was not present at the

16   *Batson* hearing.  *Id.* at 859.

17          Here, the trial court's error in denying rebuttal argument on defendants' *Batson*

18   challenge did not result in "actual prejudice," where the prosecutor stated a race-neutral

19   reason to strike Webster based on his anti-death penalty views, as demonstrated by his

20   questionnaire and voir dire responses.  *See Brecht*, 507 U.S. at 637.  Unlike *Ayala*, where

21   defense counsel was excluded from the *Batson* hearing, thereby depriving the petitioner of

22   "the opportunity to develop, present, and likely prevail on his *Batson* claim," 730 F.3d at

23   851, Sifuentes was not altogether prevented from raising facts and arguments to the

24   attention of the trial judge, and was not prevented from preserving evidence and arguments

25   in the record.  Furthermore, in light of the evidence of Webster's views on the death

26

27

28

United States District Court
For the Northern District of California

penalty, Sifuentes was not likely to prevail on his *Batson* challenge to striking Webster,[4]

and the trial court's clear error in denying the opportunity to rebut was harmless.

### 5.   K. Massey

On July 22, 2002, outside the presence of prospective jurors, the court noted that

the prosecutor provided a criminal history rap sheet on K. Massey, a history which he had

not disclosed in his questionnaire.  RT 4382.  After two of the defense attorneys declined to

stipulate to Massey's dismissal, Massey was questioned about the arrest record.  Massey

denied that he was ever arrested, and clarified that the rap sheet belonged to his twin

brother.  RT 4384-85.  Massey denied knowledge of his brother's arrest record, RT 4386,

and the prosecutor questioned him about knowing whether his brother was ever arrested.

RT 4398-99.

### a.   Demeanor

In explaining why he exercised a peremptory strike against K. Massey, the

prosecutor explained that Massey "'was the one that obviously didn't like me.  He was

irritated at the questions I was asking, wasn't answering them straight up, in my opinion.'"

Answer at 14 n.6 (quoting RT 8946).[5]  The state court found credible the prosecutor's

reason for striking Massey because Massey was irritated by the prosecutor's questions

about his twin brother.  Slip op. at 10-11.  In light of the voir dire transcript showing that the

prosecutor asked Massey to provide his social security and driver's license numbers, and

asked further questions about Massey's brother's arrest record, the state court's finding,

that the prosecutor's reason for dismissing Massey because he was irritated by the

questions was race-neutral, is not clearly unreasonable.

---

[4]      Nor has Sifuentes demonstrated prejudicial error by the trial court in denying
him the opportunity to rebut the prosecutor's proffer of race-neutral reasons for striking the
other jurors who were the subject of his first and second *Wheeler* motions.  The court notes
that the trial court permitted rebuttal argument with respect to Thompson and Gibson, who
were the subject of the defendants' third *Wheeler* motion.  RT 8977.

[5]      Page 8946 is misplaced between pages 8951 and 8952 in the copy of the
Reporter Transcript that was submitted by respondent.  Supp. Ex. 2, Vol. 44.

United States District Court
For the Northern District of California

### b.   Untruthfulness

The prosecutor also stated his opinion that Massey "was deceptive to this court and did not reveal that he knew anything about brother's arrests and claimed, very lamely, that somehow this twin brother, he knew nothing about any of his arrests, and then he said at some point, oh, yeah, there might have been some incident in Alameda.  I think the man lied to this court."  RT 8947.  Sifuentes does not address this basis for striking Massey, and does not argue that this reason was pretextual.  Massey did not indicate in his questionnaire that his twin brother was arrested, and denied knowledge of any arrests, despite a four-page rap sheet.  In light of the evidence in the record, it was reasonable for the state court to find that the prosecutor's reason for striking Massey, because the prosecutor believed that Massey had been deceptive about not disclosing his brother's arrests, was credible and not pretextual.  Slip op. at 10-11.

### c.   Postal Worker

The prosecutor also stated that he struck Massey because he was a postal worker because "I've never liked postal workers on juries.  They're lazy."  RT 8947.  Sifuentes contends that this is a highly negative stereotype about postal workers and African-American government workers.  Traverse at 58.  This argument does not warrant relief under *Batson.*  Although the prosecutor's poor view of postal workers may not be warranted, under clearly established federal law, "so long as the reason is not inherently discriminatory, it suffices."  *Rice*, 546 U.S. at 338.

### d.   Nonresponsiveness

The prosecutor added his opinion that Massey "apparently didn't seem to understand any of the questions.  Even in the best light, reading the questions and his answers, his answers were just totally nonresponsive and did not in any way, shape or form enlighten us in terms of what his true views about it were."  RT 8947.  The prosecutor cited the voir dire transcript to show that "in his questioning, he gave completely equivocal answers on the death penalty."  RT 8947.  The state court found that the prosecutor gave a

credible reason to strike Massey because he gave "nonresponsive and unenlightening

answers."  Slip op. at 11.

To demonstrate that this reason was pretextual, Sifuentes argues that two of the

seated jurors indicated confusion about the legal issues raised during voir dire, such as

Juror No. 3's confusion about specific intent and Juror No. 4's confusion about the felony-

murder rule.  Traverse at 59.[6]  Sifuentes also identifies a white prospective juror, Jacobs,

whose questionnaire demonstrated that he was scarcely literate and that he was neutral

about the death penalty, yet the prosecutor did not exercise a peremptory strike against

him.  Id.  See RT 8951 (dismissing Jacobs pursuant to peremptory strike by Sifuentes).

The prosecutor expressed a specific concern about Massey's nonresponsive answers in

voir dire, by contrast to the seated jurors, who Sifuentes contends showed some confusion

about the legal issues, or the prospective juror who appeared illiterate.  Sifuentes does not

contend that any of these jurors, or prospective juror, gave nonresponsive or

unenlightening answers comparable to Massey's, and this comparison does not

demonstrate that Massey was treated differently because of race.  The state court's finding

that the prosecutor gave a credible reason for striking Massey because he gave

"nonresponsive and unenlightening answers," is reasonable in light of the voir dire

transcript, which reflects that Massey did not give direct responses to the court's

preliminary questions or many of the prosecutor's questions, particularly about whether he

could vote for the death penalty with respect to the non-shooters.  RT 4388-4408.

**6.    F. Barnes**

**a.    Demeanor and Experience With Police**

In striking F. Barnes, the prosecutor explained that Barnes was "extremely hostile

and unfriendly to me.  It was clear he didn't like me.  He wouldn't answer any of the

questions; he was very closed."  RT 8972.  The prosecutor further explained, " And it turns

---

[6]    Sifuentes previously identified Juror No. 4 as African-American, Traverse at 7, but includes her in his comparative juror analysis.  Regardless of Juror No. 4's race, the prosecutor's concern about Massey's equivocal responses is distinguishable from the issues of confusion identified by Sifuentes.

**United States District Court**
For the Northern District of California

out, we found out later why: he had bad experiences with the police.  He gave short, snippy answers.  He's the one who had the gun pointed at his head.  Never smiled at me, but he certainly smiled at Walt when Walt was questioning him.  I made a note of that."   RT 8972. Elaborating on his questionnaire response during voir dire, Barnes explained that he was stopped by police in the 1970's because he matched the description of a suspect, and a gun was pointed at his head.  RT 6396-97 ("When someone puts a cold metal against your head and pops the trigger because you fit a description of a store that was robbed in the area, and you're given no explanation other than that, good luck to you.").  Barnes admitted it was "possible" that his feelings about how he was treated by police could have some effect on sitting on this case, where a policeman was the victim.  RT 6397.

        Although the state court did not make a specific finding as to whether Barnes was unfriendly to the prosecutor, the state court's finding that the prosecutor's race-neutral explanation was credible was not unreasonable in light of the record, particularly in light of Barnes's view of the criminal justice system.  *Rice*, 546 U.S. at 341-42.  The record of Barnes's voir dire supports the state court's finding that "the fact that Barnes had a negative experience with the police which prosecutor opined might be an issue in this case was a valid concern."  Slip op. at 12.  *See* RT 6396-97.

                        **b.    Views About the Death Penalty**

        The prosecutor also noted that Barnes donated to the ACLU and Amnesty International, groups that are opposed to the death penalty.  RT 8972.  As respondent concedes, Barnes never explicitly stated that he had reservations about the death penalty, Answer at 17, but the prosecutor noted that he couldn't get Barnes to express his opinions about capital punishment.  RT 8972.  *See* RT 6390 ("I don't have a philosophy.  I know it exists.").  Sifuentes cites the questionnaire where Barnes indicated that he was "moderately in favor" of the death penalty, and his voir dire responses indicate that "it would depend on the case, on the situation."  Traverse at 62-63.  Sifuentes also contends that the prosecutor was badgering Barnes despite his open-minded statements about the death penalty. Traverse at 64.  However, the voir dire transcript also shows that Barnes was at times

United States District Court

For the Northern District of California

argumentative and hostile when pressed on his views about the death penalty: "I thought I answered that earlier when I said I thought there were times there [sic] would be appropriate and it would be on a case-by-case basis. . . . I don't have a list.  I've never been in a jury case of this magnitude or involved in this kind of thing before, so I really don't know."  RT 6393-94.  Furthermore, Sifuentes acknowledges that the lawyers kept asking Barnes to repeat himself because they were having trouble hearing him.  Traverse at 64.  In light of the record, particularly Barnes's hostile responses to the prosecutor's questions about his personal views on the death penalty, it was not unreasonable for the state court to find credible the prosecutor's concern that "the death penalty would not be an option" for Barnes.  RT 8974.

As further grounds for dismissing Barnes, the prosecutor explained that Barnes had previously filed for bankruptcy, which might indicate lack of responsibility.  RT 8973.  The prosecutor also believed that there were better jurors directly after Barnes.  RT 8974.  Sifutentes does not challenge these reasons as pretextual, and the state court's finding, that these were credible, race-neutral reasons for striking Barnes, is not unreasonable in light of the evidence in the record.

### 7.    K. Scruggs

#### a.    Single Mother

The prosecutor dismissed K. Scruggs because she had a conviction for forgery, which Sifuentes concedes would have been a legitimate reason to strike her, but for the prosecutor's subjective intent.  Traverse at 60.  The prosecutor gave two other reasons for dismissing K. Scruggs, starting with the fact that she was "a single mother, never married, with a seven-year-old daughter.  She's only 27 years old.  I didn't like that.  To me, that shows a lack of responsibility."  RT 8974.  Sifuentes contends that the prosecutor expressed a negative stereotype of African-American women, reflected also in his explanation for dismissing A. Jaspar and R. Gibson.  Sifuentes argues that this stereotyping demonstrates that the prosecutor was actually motivated by considerations of race.  Traverse at 30-31, 60.  The record demonstrates, however, that the prosecutor's

United States District Court

For the Northern District of California

1  comment about Scruggs did not rely on a race-based presupposition, unlike *Bishop*, where

2  the Ninth Circuit held that the prosecutor used residence as a surrogate for "deeply

3  ingrained and pernicious" racial stereotypes where he excused a prospective juror from

4  Compton because he believed the struck juror was "likely to take the side of those who are

5  having a tough time, aren't upper middle class, and probably believes that police in

6  Compton in South Central L.A. pick on black people."  *United States v. Bishop*, 959 F.2d

7  820, 822, 825 (9th Cir. 1992) (reversing conviction for *Batson* violation), *overruled on other*

8  *grounds by United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc).

9        Here, the prosecutor did not mention race or draw on any racial stereotype.  There is

10  nothing in the record to suggest that the prosecutor's concern about single mothers was

11  tied to race or was motivated by discriminatory intent, and Sifuentes has not shown, nor

12  does he argue, that non-African-American single mothers were treated differently.  In light

13  of the record, and given that "[t]here is no 'discriminatory intent . . . inherent in the

14  prosecutor's explanation,'" the court finds none.  *Boyde v. Brown*, 404 F.3d 1159, 1171, *as*

15  *amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005) (holding that prosecutor's use of

16  residence was race-neutral) (citing *Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam)

17  (internal citation and quotation marks omitted)).

18                    **b.    Views About Death Penalty**

19        The prosecutor also believed that Scruggs "was not going to be able to consider the

20  death penalty for the non-shooters," noting that "I kept pressing her and she kept dancing

21  around the question, never would answer that question directly."  RT 8975.  During voir

22  dire, Scruggs stated that she could vote for the death penalty, *see* RT 5166, but when

23  asked whether the death penalty was a realistic option for her as to the non-shooting

24  defendants, she stated, "It could be an option, but it's not necessarily something that I

25  would be able to place on someone that did not actually commit the shooting."  RT 5173.

26  The record also shows that Scruggs understood that this was a death penalty-eligible case

27  for the non-shooters: "Based on when we were doing the questionnaires, and the way that

28  it was stated in the questionnaire, that based on him even being part of the crime, makes

46

United States District Court
For the Northern District of California

1    this eligible for the death penalty and I agree." RT 5177.  The state court found that the

2    prosecutor properly dismissed Scruggs because of her hesitation about imposing the death

3    penalty on a nonshooter.  Slip op. at 13.

4         Sifuentes contends that the prosecutor was willing to accept other jurors who also

5    gave conflicting responses, particularly Alternate Juror No. 2, who explained, "if I feel the

6    death penalty is warranted by the action, I would vote for it.  I'm not crazy about assigning

7    the death penalty for anybody.  I don't think that's a great thing to be proud of doing.  But if

8    it's deserved, I would be willing to do that." RT 5603.  He also stated that he understood

9    the concept of the felony-murder rule, but "if they haven't done the shooting, I'm not sure, to

10   be honest with you." RT 5606.  Upon further questioning, Alternate Juror No. 2 stated that

11   he "didn't realize that the law of [the] state of California indicated they would all be guilty,"

12   and stated that he would follow the law.  RT 5607.  Sifuentes does not point to any

13   statement by Alternate Juror No. 2 expressing unwillingness to vote for the death penalty

14   for the non-shooters, as Scruggs did.  In light of the evidence in the record, the state court's

15   determination that the prosecutor's reasons for striking Scruggs were not pretextual was

16   not clearly unreasonable.

17        E.    *Batson* Relief

18        Having found *Batson* violations with respect to two African-American jurors but not

19   with regard to the remaining seven, the court has considered whether the absence of

20   discriminatory motive as to the latter larger group, suggests an absence of such motive with

21   regard to the former.  Aside from authority establishing that *Batson* relief is warranted

22   where the removal of just one juror was motivated by discriminatory intent, *Ali*, 584 F.3d at

23   1193, the court's decision rests on several other factors.

24        The court appreciates that jury selection is a dynamic, fast-paced process and that

25   mistakes are made and recollections are not always clear.  The cold record on habeas

26   review can never accurately capture the body language, tone of voice, and attitudes

27   reflected by potential jurors under questioning, which inform the questions asked by the

28   lawyers and the court and their decisions regarding challenges.  In this case many of the

United States District Court

For the Northern District of California

1   responses given by the seven prospective jurors who have been found not to have been

2   challenged in violation of *Batson*, are similar to the responses given by the two whose

3   dismissals did violate *Batson*.  The court has, however, endeavored to explain the

4   significance of the differences, subtle as they might be.  Ultimately, the court is unable to

5   conclude that the prosecutor's mischaracterizations of several of the responses and his

6   seemingly pretextual reasons proffered for the challenges of two of the jurors, were merely

7   the result of mistakes in his recollection or confusion about which juror to whom he was

8   referring.

9       First, it appears from the transcript of the *Wheeler/Batson* hearing, that the lawyers

10  and the trial judge had a copy of the transcript of the voir dire, as the prosecutor referred to

11  some jurors' responses by page number.  While it is not clear whether the available

12  transcript was complete or partial, the availability of a transcript should have diminished, to

13  some extent, the likelihood of mischaracterization of a juror's response.  More significantly,

14  the petitioner's prima facie case, built on statistical evidence, provides a powerful argument

15  that there was a discriminatory motive in striking 75% of the African-American prospective

16  jurors.  Unfortunately, the trial court's error in failing to permit rebuttal not only denied

17  defense counsel the opportunity to challenge the prosecutor's race-neutral reasons before

18  making its step-three *Batson* decision, but may have also eliminated an opportunity for the

19  prosecutor to substantiate or rehabilitate his race-neutral reasons for exercising peremptory

20  strikes against those jurors.

21      Controlling circuit authority compels the result here, that the prosecutor was

22  motivated by discriminatory intent in striking Thompson and Gibson.  In particular, the

23  prosecutor's mischaracterization of Thompson and Gibson's religious beliefs and their

24  views about the death penalty, is indicative of pretext.  *Ali*, 584 F.3d at 1192.  Just one

25  pretextual explanation "naturally gives rise to an inference of discriminatory intent," *id.*, and

26  even where other, potentially valid explanations are offered, "if a review of the record

27  undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons

28  may be deemed a pretext for racial discrimination." *Kesser*, 465 F.3d at 360.  Further, by

United States District Court

For the Northern District of California

1  accepting the prosecutor's facially neutral explanations without considering comparative

2  evidence in the record, the state court unreasonably accepted his nonracial motives as

3  genuine.  *Ali*, 584 F.3d at 1193.  This unreasonable determination by the state court

4  warrants relief under *Batson*.

5  **III.    Dismissal for Cause**

6          The operative petition claims that the trial court violated the equal protection clause

7  and the due process clause when it excused two African-American prospective jurors for

8  cause.  Fourth Am. Pet., Claim Two.  Sifuentes also argues that the prosecutor's use of a

9  juror's failure to disclose criminal history, as a basis for challenging the juror for cause,

10 gives further support to his *Batson* claim.  Traverse at 66.  Although Sifuentes attempts to

11 incorporate his *Batson* argument that the prosecutor was motivated by discriminatory intent

12 into his claim that the trial court violated his constitutional rights, Sifuentes concedes that

13 respondent "correctly identifies Claim Two" as alleging that "the trial court violated

14 Petitioner's Sixth Amendment right to trial by an impartial jury" by dismissing ten

15 prospective jurors, seven of whom were African-American, without questioning them about

16 their failure to disclose their prior arrests.[7]  Traverse at 65.   Because the court has fully

17 considered the *Batson* challenge, which was raised in Claim One with respect to the

18 prosecutor's peremptory strikes, the court limits its analysis of Claim Two to whether any

19 error by the trial court in dismissing jurors for cause violated Sifuentes' rights to an impartial

20 jury, due process, and equal protection.

21          **A.    Rights to Impartial Jury and Due Process**

22                  **1.    Legal Standard**

23          A trial court may exclude for cause any prospective juror who will be unable to

24 render an impartial verdict based on the evidence.  *See Irvin v. Dowd*, 366 U.S. 717,

25 _____

26          [7]      Respondent contends that 11 jurors were removed for cause, Answer at 25,
27 but Sifuentes notes that he could only identify 10 jurors who were dismissed for cause,
   seven of whom were African-American.  Respondent's citations to the trial record identify
28 only 10 potential jurors who were dismissed for cause.  Answer at 25-26.  Sifuentes
   concedes that the numerical discrepancy does not affect the legal analysis of his claim.
   Traverse at 65 n.9.

United States District Court

For the Northern District of California

723-24 (1961).  A prospective juror must be removed for cause if his views or beliefs would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.  *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985).  "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury."  *Tinsley v. Borg*, 895 F.2d 520, 523-34 (9th Cir. 1990) (internal quotations omitted).  The state court's determination of juror partiality is entitled to a presumption of correctness on federal habeas review.  *See Wainwright*, 469 U.S. at 429.  *See also Perez v. Marshall*, 119 F.3d 1422, 1426 (9th Cir. 1997) (on habeas review, a trial court's findings regarding juror fitness are entitled to special deference).

To disqualify a juror for cause requires a showing of either actual or implied bias, "'that is . . . bias in fact or bias conclusively presumed as a matter of law.'"  *United States v. Gonzalez,* 214 F.3d 1109, 1111-12 (9th Cir. 2000) (quoting 47 Am. Jur. 2d Jury § 266 (1995)).  While a juror's intentionally concealing information "may shed light" on his partiality, "it is an open question whether dishonesty is required before bias may be found."  *Fields v. Woodford*, 309 F.3d 1095, 1105-06 (9th Cir.) (remanding for evidentiary hearing to determine whether juror intentionally concealed information about his family member), *amended by* 315 F.3d 1062 (9th Cir. 2002).

**2.      Trial Court's Failure to Conduct Voir Dire**

All prospective jurors were asked in the questionnaire whether "you, any family member or close friend [have] ever been accused of, arrested for, charged with or convicted of any crime?  If yes, please explain."  RT 2283.  Based on respondent's citations to the record, 14 potential jurors were identified as having been arrested for or convicted of a crime that was not disclosed on the juror's questionnaire.[8]  The trial court dismissed D. Nethercott on its own motion because she had suffered a prior felony conviction, RT 7764-

---

[8]      Respondent represents that the trial court denied the defendants' request for disclosure of the arrest records of all prospective jurors, but ordered the prosecutor to disclose any misdemeanor convictions or any arrests a potential juror suffered.  Answer at 24 (citing RT 1353-54).  That portion of the trial record is not in the habeas record before the court, but there appears to be no dispute as to how the potential jurors' prior arrests and convictions were discovered and made part of the record in the trial court.

65, and denied the prosecutor's challenges for cause as to three of those 14 prospective jurors: Massey, who was mistaken for his twin brother, RT 4398-4409, and subsequently dismissed on the prosecutor's peremptory challenge; J. Quiroz, who was the subject of mistaken identity, RT 8244-45, 8286-87; and G. Rosenberg, whose prior criminal background was not disclosed to the defense, RT 4554-59.  Of the remaining 10 jurors who were dismissed on the prosecutor's challenges for cause, Sifuentes identifies seven of them as African-American:

> 1.    K. Nelson, RT 4589-91, 4647-48
>
> 2.    E. Pecot (African-American), RT 5341-44
>
> 3.    J. Cormier (African-American), RT 6626-27
>
> 4.    E. Darby (African-American), RT 6901-02
>
> 5.    R. Smith (African-American), RT 7781-83
>
> 6.    J. Chappell (African-American), RT 7798
>
> 7.    C. Wong, RT 7828-29
>
> 8.    H. Bryant, RT 8443-44
>
> 9.    V. Woll (African-American), RT 8577-78
>
> 10.   D. Lee (African-American), RT 8621-22

Sifuentes contends that the trial court summarily granted the prosecutor's challenges for cause without conducting voir dire of the jurors in question, in violation of his Sixth Amendment right to an impartial jury.  However, Sifuentes cites no Supreme Court authority granting habeas relief based on the trial court's failure to conduct voir dire of jurors who failed to disclose their criminal records during jury selection.  *See Bell v. Uribe*, 729 F.3d 1052, 1061 (9th Cir. 2013) (reversing grant of habeas relief where petitioners failed to identify any directly controlling Supreme Court precedent that contravened the state court's determination that removal of a juror, who conducted her own research and reviewed her conclusions with the jury, did not violate Sixth Amendment right to impartial jury), *pet. for reh'g and reh'g en banc filed* (Oct. 10, 2013).

United States District Court
For the Northern District of California

1    The state court considered Sifuentes's arguments that dismissing the prospective

2   jurors for cause without an investigative voir dire violated his rights to due process and an

3   impartial jury.  Slip op. at 18-19.  The state court held that concealment of prior criminal

4   charges or convictions constituted good cause for discharging a juror, but acknowledged

5   that the better practice would be for the trial court to afford the prospective jurors an

6   opportunity to confirm or rebut the information.  Slip op. at 18-19.  The state court further

7   held that any error in the trial court's failure to conduct voir dire was harmless because a

8   defendant is not entitled to a jury composed of any particular jurors, but only a jury

9   composed of qualified and competent persons.  Slip op. at 19 (citations omitted).

10    Sifuentes contends that his Sixth Amendment rights were violated when the trial

11   court dismissed those jurors without questioning them, Traverse at 66, but cites no

12   controlling Supreme Court precedent requiring the trial court to inquire further where a juror

13   failed to disclose his or her criminal history in response to a questionnaire.  Sifuentes does

14   not expressly raise a due process argument in these habeas proceedings to challenge the

15   dismissal for cause of the potential jurors who failed to disclose their criminal history, but

16   even if this claim were construed as a due process challenge, Sifuentes fails to

17   demonstrate that the trial error, if any, "had substantial and injurious effect or influence" in

18   order to warrant habeas relief.  *Brecht*, 507 U.S. at 637-38.  *See United States v. Calhoun*,

19   542 F.2d 1094, 1103 (9th Cir. 1976) ("A defendant is entitled to an array of impartial jurors

20   to whom he may direct his peremptory challenges but, having been provided with such a

21   panel, he suffers no prejudice if a juror, even without sufficient cause, is excused by the

22   court.").

23    As clearly established by the Supreme Court, a defendant "is entitled to a fair trial

24   but not a perfect one."  *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553

25   (1984) (citation omitted).  In *McDonough Power Equip.*, the Supreme Court recognized the

26   importance of truthful answers by prospective jurors to protect the right to an impartial jury:

27   "Demonstrated bias in the responses to questions on voir dire may result in a juror being

28   excused for cause; hints of bias not sufficient to warrant challenge for cause may assist

United States District Court

For the Northern District of California

1   parties in exercising their peremptory challenges.  The necessity of truthful answers by

2   prospective jurors if this process is to serve its purpose is obvious."  464 U.S. at 554.

3   Furthermore, the Ninth Circuit has recognized that lying during jury selection proceedings

4   gives rise to an inference of implied juror bias.  *Dyer v. Calderon*, 151 F.3d 970, 979 (9th

5   Cir. 1998).  *Cf. Sanders v. Lamarque*, 357 F.3d 943, 949 (9th Cir. 2004) (holding that trial

6   court's dismissal of a lone holdout juror, for failing to disclose her experience with gangs

7   during voir, was objectively unreasonable where record demonstrated that juror provided

8   responsive and direct answers to questions posed to her, that she was forthcoming with

9   information during voir dire, and that there was no evidence that she intentionally or

10  unintentionally concealed information).

11      Here, the state court's determination that good cause existed for the removal of the

12  10 jurors at issue is supported by the evidence in the record that those jurors did not

13  disclose relevant facts about their criminal history in their questionnaires, and is not clearly

14  unreasonable.  Furthermore, in the absence of controlling Supreme Court authority

15  requiring the trial court to question prospective jurors about their failure to disclose their

16  criminal history, the state court's denial of Sifuentes's Sixth Amendment and due process

17  claims is not contrary to, or an unreasonable application of, clearly established federal law.

18      **B.**      **Equal Protection Challenge**

19      Sifuentes further contends that the prosecutor cited their failure to disclose criminal

20  records as a pretext for dismissing African-American jurors, arguing that some of the

21  challenges for cause "were borderline, at best," and that some of the African-American

22  jurors were dismissed, without process, "for failing to disclose convictions that had been

23  mitigated or compromised in some way."  Traverse at 66-67.  Although Sifuentes casts this

24  argument as further support for his *Batson* claim that the prosecutor was motivated by

25  discriminatory intent, the court construes this argument as an equal protection claim, as it

26  was raised in the operative petition, challenging the trial court's decision to grant the

27  prosecutor's challenges for cause.

28

United States District Court

For the Northern District of California

1          **1.      Legal Standard**

2          A claim of systematic exclusion of members of a particular ethnic group from a jury

3  selection process can make out a violation of equal protection.  *Castaneda v. Partida*, 430

4  U.S. 482, 494 (1977) (affirming grant of habeas relief for purposeful discrimination in grand

5  jury selection).  *See United States v. Mitchell*, 502 F.3d 931, 952 (9th Cir. 2007)

6  (recognizing that a defendant can establish a violation of his equal protection rights if he

7  can show purposeful racial discrimination by the district court in striking jurors for cause)

8  (citing *Alexander v. Louisiana*, 405 U.S. 625, 626 n.3 (1972) (noting that principles

9  prohibiting exclusion from jury service on account of race "are essentially the same for

10 grand juries and for petit juries")).

11         To establish a prima facie equal protection claim, a petitioner must (1) establish that

12 the group is a "recognizable, distinct class, singled out for different treatment under the

13 laws, as written or as applied"; (2) prove the degree of underrepresentation; and

14 (3) discriminatory intent.  *United States v. Esquivel*, 88 F.3d 722, 725 (9th Cir. 1996)

15 (quoting *Castaneda*, 430 U.S. at 494).  "The third step, discriminatory intent, may be

16 established by showing that a selection procedure 'is susceptible of abuse or is not racially

17 neutral,' thus supporting the presumption of discrimination raised by the statistical showing

18 under step two."  *Id.* (quoting *Castaneda*, 430 U.S. at 494).  To establish an equal rights

19 violation, a purpose to discriminate "'may be proven by systematic exclusion of eligible

20 jurymen of the proscribed race or by unequal application of the law to such an extent as to

21 show intentional discrimination.'"  *Mitchell*, 502 F.3d at 952 (quoting *Akins v. Texas*, 325

22 U.S. 398, 403-04 (1945)).

23         "Once the defendant has shown substantial underrepresentation of his group, he

24 has made out a prima facie case of discriminatory purpose, and the burden then shifts to

25 the State to rebut that case."  *Castaneda*, 430 U.S. at 495.  The government may rebut a

26 prima facie equal protection violation by showing "'that permissible racially neutral selection

27 criteria and procedures have produced the monochromatic result.'"  *See Castaneda*, 430

28 U.S. at 495-496; *Esquivel*, 88 F.3d at 727 (most crucial factor is discriminatory intent, and

United States District Court

For the Northern District of California

1  Hispanics, although recognized as distinct class, were not shown to be singled out for

2  different treatment under the laws).

3              **2.      Lack of Discriminatory Intent**

4         The state court denied Sifuentes's claim that the trial court violated the right to equal

5  protection in jury selection, citing authority recognizing a criminal defendant's Sixth

6  Amendment right to a jury drawn from a representative cross-section of the community.

7  Slip op. at 19 (citing *People v. Howard*, 1 Cal. 4th 1132, 1159 (1992) (holding that the

8  defendant failed to show systematic exclusion to establish a prima facie violation of the fair

9  cross-section requirement under *Duren v. Missouri,* 439 U.S. 357, 358-367 (1979)).  In

10  *Duren*, 439 U.S. at 364, the Supreme Court established a three-prong test for a defendant

11  to establish a prima facie violation of the Sixth Amendment fair cross-section requirement:

12  (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that

13  the representation of this group in venires from which juries are selected is not fair and

14  reasonable in relation to the number of such persons in the community; and (3) that this

15  underrepresentation is due to systematic exclusion of the group in the jury selection

16  process.  In contrast to an equal protection challenge, "a prima facie case for establishing a

17  Sixth Amendment, fair cross-section violation does not require the appellant to prove

18  discriminatory intent or require that the appellant be a member of the distinct, excluded

19  group." *Esquivel*, 88 F.3d at 725.  The Ninth Circuit has recognized, however, that the

20  analytical framework for establishing a prima facie equal protection challenge "is somewhat

21  similar to a Sixth Amendment fair cross-section challenge." *Mitchell*, 502 F.3d at 952.

22         Here, the state court held that Sifuentes failed to show systematic discrimination

23  against African-American jurors, finding that the trial court applied a race-neutral criterion

24  for dismissing the jurors for cause.  Slip op. at 19.  Sifuentes does not dispute the state

25  court's finding that the trial court stated prior to voir dire that it would grant the prosecutor's

26  challenges for cause as to jurors who concealed their criminal backgrounds.  Slip op. at 19.

27  The state court also held that Sifuentes failed to show that African-American jurors were

28  treated differently than non-African-American jurors for failing to reveal their criminal

1   backgrounds, and noted that the prosecutor challenged four non-African-American jurors

2   for the same reason.  Slip op. at 19.

3          The state court did not make a specific finding that discriminatory intent was lacking.

4   To the extent that the state court determined that there was no systematic exclusion of

5   African-American jurors, and there is no other basis in the record for demonstrating

6   discriminatory intent, the state court's decision is reasonable in light of the record.[9]  There

7   is no evidence that indicates that the trial court's jury selection criteria, in dismissing for

8   cause jurors who failed to disclose their criminal history, was susceptible of abuse or was

9   not racially neutral.  *See Casteneda*, 430 U.S. at 494 ("a selection procedure that is

10  susceptible of abuse or is not racially neutral supports the presumption of discrimination

11  raised by the statistical showing"); *Mitchell*, 502 F.3d at 952-53 (defendant failed to

12  establish a prima facie case of equal protection violation because he did not explain "how

13  the venire-selection process was susceptible to abuse").  In light of the record, the state

14  court's determination, that the dismissal for cause of African-American jurors for failure to

15  disclose criminal backgrounds did not violate Sifuentes's right to equal protection, is not

16  clearly unreasonable.

17                                    **CONCLUSION**

18         For the reasons set forth above, Sifuentes's petition for a writ of habeas corpus is

19  CONDITIONALLY GRANTED.  Accordingly, Sifuentes's judgment and conviction are

20  VACATED, and respondent shall release Sifuentes from custody unless the state

21  commences proceedings to retry him within 120 days of the date of entry of judgment on

22

23  _____

24         [9]      Sifuentes does not raise any argument that the state court erroneously or
    incorrectly applied the *Duren* test, rather than the *Castaneda* test, in denying his equal
25  protection claim, but even if the state court's "use of the wrong legal rule or framework"
    constitutes error under the "contrary to" prong of § 2254(d)(1), the state court's decision
26  would not be entitled to deference and the court would proceed to consider the equal
    protection claim de novo.  *Frantz v. Hazey*, 533 F.3d 724, 734-35 (9th Cir. 2008) (en banc);
27  *Runningeagle v. Ryan*, 686 F.3d 758, 785 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2766
    (2013).  Even under de novo review, Sifuentes fails to show that the trial court's dismissal
28  of jurors for cause either was susceptible to abuse or was not racially neutral, and fails to
    establish a prima facie case of equal protection violation under *Castaneda*, 430 U.S. at
    494.

56

this order.  This order fully adjudicates the petition and terminates all pending motions.  The

clerk shall close the file.

The clerk is directed to send an informational copy of this order to the district

attorney of Alameda County, in addition to the usual service on counsel of record via e-

filing.

**IT IS SO ORDERED.**

Dated: December 3, 2013

_____
PHYLLIS J. HAMILTON
United States District Judge

United States District Court

For the Northern District of California